UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| TIMOTHY SULLIVAN et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV-04-32-B-W |
| | ) | |
| CITY of AUGUSTA, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTIONS FOR JUDGMENT ON LIABILITY**

To march is to speak.  A parade, as speech, especially as political speech, invokes the First Amendment and commands this Court's protection.  A march can be a powerful and effective community expression of ethos:  to celebrate our heroes – as on Veterans' Day; to applaud our commonly-held values – as on July 4th; or, consistent with this Country's longest-held traditions, to protest our policies and attempt to effect change – as in Selma or Washington, D.C.  Because the right to march lies at the core of our freedoms, this Court concludes Maine's capital city of Augusta may regulate parades only at the edges.  It strikes down municipal regulations based on content or  viewpoint discrimination and leaves  standing those  that are wholly neutral.

**I.  FACTUAL BACKGROUND[1]**

This case marches on.  On March 15, 2004, Timothy Sullivan sought a temporary restraining order against the city of Augusta's parade ordinance, claiming its provisions violated the First Amendment rights of the March for Truth Coalition.  The Coalition wished to parade on the streets of Maine's capital city to advocate for a host of causes, both political and economic.

---

[1] In reciting these facts, this Court has imported portions of its earlier decision on Mr. Sullivan's Motion for Temporary Restraining Order.  *See Sullivan v. City of Augusta,* 310 F. Supp. 2d 348 (D. Me. 2004)(*Sullivan I*).

This Court granted Mr. Sullivan's motion for temporary restraining order only as to the city's bond requirement, leaving the remainder of the ordinance intact.  The Plaintiffs have regrouped and reformed, adding a party, a lawyer, and additional evidence raising new issues.  This time they have sustained their burden and this Court grants judgment in their favor.

### A.  Parade Ordinance Fee

The relevant portions of the Parade Ordinance, § 13-5, provide:

> (a) No less than thirty (30) days prior to an intended parade, march or other use of public ways within the city, a permit must be applied therefor to the City Police Chief or his designee.  The City Manager may allow a shorter time frame for good cause shown.
>
> . . . .
>
> (c) Within ten (10) days of applying for the permit, as a condition to its issuance, the applicant must meet with the Police Chief to discuss and attempt to agree on the details of the route and other logistics.
>
> (d) The Police Chief may deny the permit or alter the route for traffic or safety reasons and impose reasonable conditions including, but not limited to, time limits, requirement to keep moving and on route, no amplification or sound truck, no explosives, fireworks or other artificial noise.
>
> (e) The cost of the permit shall be one hundred dollars ($100.00), plus the costs of traffic control per city collective bargaining agreement and clean up costs, as estimated by the Police Department.  The permit fee will not include the cost of police protection for public safety.  The one hundred dollar ($100.00) fee is payable at the time the application is submitted and the balance at the time of its issuance.  The City Council may modify this fee from time to time by Order.

(Code 1970 § 15-6; Ord. No. 244, 1-6-92; Ord. No. 106, 9-8-03; Ord. No. 54, 4-5-04)(Docket # 50 – Ex. 2).  If the permit is denied or modified, the applicant may appeal in writing within five days to the City Clerk's office "for determination by the City Council."  *Id.* at 3-15(g).

### B.  Mass Outdoor Gathering Ordinance (MOGO).

Section 3-116 of the MOGO provides:

> (a) It is recognized that a mass outdoor gathering attended by two hundred (200) or more persons may create a hazard to public health and safety. Accordingly, it is deemed to be appropriate and in the interest of the public welfare to regulate the conduct of such gatherings in order to protect the public health and safety.

> (b) No person shall sponsor, promote or conduct a mass outdoor gathering with the intent to attract or the understanding that the gathering may attract two hundred (200) or more persons until a permit has been obtained thereof from the Augusta Police Chief or his designee. The application for a permit must be submitted no less than thirty (30) days prior to the mass gathering, unless the City Manager allows a shorter time frame for good cause shown.

(Code 1970, § 3-57; Ord. No. 105, 9-8-03).

Section 3-117 directs that:

> The Police Chief shall grant a permit to sponsor, promote or conduct a mass outdoor gathering to be attended by two hundred (200) or more persons upon written application therefore unless it appears to the Police Chief within a reasonable certainty that such gathering will unreasonably endanger the public health or public safety.

(Code 1970, § 3-58; Ord. No. 105, 9-8-03).

Section 3-118 states:

> Prior to the issuance of a permit under this article, the applicant shall furnish the Police Chief with adequate proof that the following will be available at the gathering:

> (1) The furnishing of adequate and satisfactory water supply and sewer facilities;
> (2) Adequate refuse storage and disposal facilities, adequate medical facilities;
> (3) Adequate fire and police protection; and
> (4) Such other matters as may be appropriate for security of health and safety.

> The Police Chief may review such plans, specifications and reports as is deemed necessary for a proper review of the proposed mass gathering.

(Code 1970, § 3-59, Ord. No. 105, 9-8-03).

The permit fee is $100.00, plus the "cost estimated by the City for cleanup and traffic control". Section 3-120.  The MOGO provisions do not apply "to athletic events conducted by the Board of Education, Little League or other organizations, provided alcohol is not available." Section 3-122.

### C.  The Applications

#### 1.  Timothy Sullivan's February 9, 2004 Application

On February 9, 2004, on behalf of the March for Truth Coalition, Mr. Sullivan filed an "Application for Parade Permit" with the City Police Department, proposing three parade routes. The permit stated the parade would be held on Saturday March 20, 2004, between 12:30-2:00 p.m.  *Sullivan,* 310 F. Supp. 2d at 351.  Of three approved parade routes, Augusta Deputy Police Chief Major Gregoire (Major Gregoire) determined the first would require twelve officers and two police vehicles for traffic control, costing $2,077.44 and the second, ten officers and two police vehicles, costing $1,761.20.  In later discussions, Major Gregoire approved a third route, costing $1,543.08.  *Id.*  To calculate these costs, Major Gregoire considered only the following factors:  "the route to be taken, the duration of the route, the estimated number of people who will attend, whether marchers intend to close the entire road or only one direction of travel, and whether there are any other events or special circumstances within the City which could affect traffic."  *Gregoire Supplemental Aff.* ¶ 6 (Docket # 50).  Major Gregoire based his assessment of traffic control needs only on factors "completely unrelated to the message to be communicated by marchers."[2]  *Id.*  Mr. Sullivan (and the March for Truth Coalition) claimed not to have the

---

[2] Major Gregoire also required the Coalition to furnish a bond of surety in the amount of $10,000.00 or evidence of appropriate insurance.  Mr. Sullivan estimated event insurance would cost approximately $450.00.  *Sullivan I,* 310 F. Supp. 2d at 351.  Mr. Sullivan and the March for Truth Coalition claimed not to have the resources to pay the cost of the bond.  *Id.*; *Sullivan Dep.* at 8-12, 17-18 (Docket # 56 – Attach. 1).  After this Court's decision on March 19, 2004, the City Council amended the Ordinance on April 5, 2004 to delete the bond provision.  *Gregoire Supplemental Aff.* at 15-16 (Docket # 50 – Ex. 2).  Section 3-119, containing a similar bond provision in the MOGO, was deleted at the same time.  *Id.*

resources to pay the permit fee. *Id.*; *Sullivan Dep.* at 8:6-12:3, 17:7-18:13 (Docket # 56 – Attach. 1).[3]

## 2. Lawrence Dansinger's August 23, 2004 Application

On August 3, 2004, Lawrence Dansinger applied for a parade permit to hold a peace march/rally on October 16, 2004 in conjunction with the Million Worker March to be held in Washington, D.C. the next day. *Pls.' Statement of Mat. Facts* at ¶ 46 (Docket # 43 – Attach. 1) (PSMF). Mr. Dansinger agreed to apply for the permit and assumed Mr. Sullivan and Tony Aman "would be doing other aspects of the organizing." *Dansinger Dep.* at 19:10-12 (Docket # 56 – Attach. 2). The Augusta Police Department responded to Mr. Dansinger's application by letter dated September 15, 2004, advising him that, in addition to the initial application fee of $100.00, approval of the parade permit was conditioned on payment of $1,979.32. *PSMF* ¶ 53. Mr. Dansinger responded by a letter from his attorney dated September 29, 2004, explaining that the permit fee of almost $2,000.00 created a substantial financial hardship for him and requesting the fee be waived because of his limited financial means. *Id.* ¶ 54. This letter explained that Mr. Dansinger's annual income was $8,400.00, asserted that he could not afford to pay the additional

---

[3] Defendant does not dispute Mr. Sullivan made this claim, but notes that at his deposition, Mr. Sullivan asserted the Fifth Amendment with respect to the amount of income on his tax returns. The City asks the Court to draw a negative inference from this assertion. *Def.'s Resp. to Pls.' Statement of Fact* at ¶ 34 (Docket # 49). A negative inference may be drawn against the party asserting a Fifth Amendment privilege in a civil action. *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976); *In re Carp,* 340 F.3d 15, 23 (1st Cir. 2003); *Mulero-Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 678 (1st Cir. 1996). When a Fifth Amendment privilege is posited in a civil action, one party's "assertion of his constitutional right should not obliterate another party's right to a fair proceeding." *Serafino v. Hasbro, Inc.,* 82 F.3d 515, 518 (1st Cir. 1996); *DirecTV, Inc. v. Lovejoy,* 366 F. Supp. 2d 132, 137 (D. Me. 2005). To balance these concerns, the Court is directed to determine whether there were "alternative means" to obtain substantially the same information. *Serafino,* 82 F.3d at 519. Here, Magistrate Judge Kravchuk concluded that, in its attempts to obtain Mr. Sullivan's tax records, the Defendant did not avail itself of the procedure set forth in the scheduling order and failed to follow the informal conference mechanism under the Local Rule. *Report of Telephone Conference and Order,* 11/15/2004 (Docket # 38). She further determined that the City "does have testimony about plaintiff's income developed during the course of the deposition." *Id.* She denied the City's Motion to Shorten the Deadline for Production of Records or in the alternative Dismiss the Claim for Invoking the Fifth Amendment. *Id.* Consistent with Magistrate Judge Kravchuk's Order, this Court declines to draw a negative inference from Mr. Sullivan's assertion of his Fifth Amendment privilege. The City has failed to demonstrate that there were no alternative means to obtain substantially the same information. *Serafino,* 82 F.3d at 519; *DirecTV, Inc.,* 366 F. Supp. 2d at 138 ("Before drawing a negative inference in a civil matter from a party's assertion of the Fifth Amendment, the court should be convinced it is necessary to do so.").

estimated permit fee, and requested that the City establish an inability to pay exception for the traffic control fees charged for free speech activities. *Id*. The City never responded. *Id*. ¶ 55. The Augusta Police Department does not consider financial hardship in acting upon an application for a parade permit. *Id*.

### D. *Sullivan I*: This Court's Previous Decision[4]

In *Sullivan I*, this Court addressed only the constitutionality of the Parade Ordinance, not the MOGO. This Court upheld the City's mandatory application fee and imposition of costs associated with police services, stating there "is no evidence ... the application fee is anything but administrative" and "the police fee is simply a mathematical computation based on the Police Chief's assessment of the police presence necessitated by the parade route." *Sullivan*, 310 F. Supp. 2d at 354. However, this Court struck down the ordinance's bond requirement, explaining that it "requires to some degree that the police chief assess the content of the proposed event" and "fails to articulate the standards by which such a determination … may be made." *Id*. at 355. In response, the City amended the Parade Ordinance and the MOGO to delete the bond provision. *See supra* fn 2.

## II. LEGAL STANDARD

The parties have submitted this case on a stipulated record, which "allows the judge to decide any significant issues of material fact that he discovers." *Boston Five Cents Sav. Bank v. Sec'y of Dep't of Housing & Urban Dev.*, 768 F.2d 5, 11 -12 (1st Cir. 1985).

## III. DISCUSSION

The Plaintiffs contend that certain of the City's ordinances are unconstitutional both on their face and as applied because they impermissibly discriminate based on content, allow too much discretion in the licensing authority, are not narrowly tailored to serve a significant

---

[4] This opinion was issued before Mr. Dansinger's application.

governmental interest while preserving ample alternatives for communication, and do not provide an exception to the large permit fee for citizens or groups for whom the fee causes a substantial financial hardship.

### A. Standing

As a threshold matter, this Court must examine the City's contention that the Plaintiffs do not have standing to raise facial challenges to the constitutionality of the MOGO and the thirty-day advance notice requirement in both ordinances. *Def.'s Resp. to Pls.' Mot. for J. on Liability and Cross-Mot. for J. on Liability and Incorporated Mem. of Law* at 15, 33 (Docket # 48)(*Def.'s Resp.*). Article III standing contains three elements: (1) "an injury in fact"; (2) "a causal connection between the injury and the conduct complained of"; and, (3) likelihood that the injury will be "'redressed by a favorable decision.'" *Lujan v. Defender of Wildlife*, 504 U.S. 555, 560-61 (1992). The first element of the standing inquiry—the injury in fact—is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 560 (citations omitted). A plaintiff must show that "'he has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)(citations omitted). Interwoven with these Article III elements are prudential considerations that limit which cases a court may hear, including the requirement that: "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Sec'y of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984)(citations omitted).

When a challenge asserts that a statute or ordinance is, on its face, unconstitutional, particularly in the First Amendment context, the type of facial challenge affects the standing

analysis.  A statute may be facially unconstitutional if (1) "it is unconstitutional in every conceivable application"; or, (2) "it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984).[5]  Concerning the first type of challenge, courts have not created "any exception from the general rule that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court".  *Id.* at 798.

However, when "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression", courts have applied a more relaxed standard.  *Munson,* 467 U.S. at 956-57; *Taxpayers for Vincent,* 466 U.S. at 799; *Forsyth County v. The Nationalist Movement,* 505 U.S. 123, 129 (1992)("it is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable…this exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court")(citations omitted); *Freedman v. Maryland*, 380 U.S. 51, 56 (1965)("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license.").  The rationale for this relaxation is that when a statute is unduly overbroad, there exists "a danger of chilling free speech" in society as a whole.  *Munson*, 467 U.S. at 956-57; *Broadrick v. Oklahoma*, 413 U.S. 601, 612-13 (1973)(discussing cases where a plaintiff has standing to bring facial overbreadth challenges,

---

[5] A successful challenge to the facial constitutionality of a law invalidates the law itself.  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982)("A 'facial' challenge . . . means a claim that the law is invalid *in toto*").

including prior restraint and unreasonable time, place and manner claims, "not because his own rights have been violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression").

Plaintiffs argue they are mounting such a facial challenge. *Pls.' Reply Mem. in Support of Mot. for J. on Liability Issues and Obj. to Def.'s Cross Motion for J. on Liability Reply* at 3 (Docket # 55)(*Pls.'s Reply*)("Because the potential application of the City's MGO and the 30-day advance notice requirements in both its Parade Ordinance and its MGO may chill the speech of the Plaintiffs or others…Plaintiffs have standing")(emphasis supplied).  As noted by the Supreme Court in *Forsyth*, a classic example of overbreadth is an ordinance that "delegates overly broad discretion to the decisionmaker."  505 U.S. at 129.  Among the attacks Plaintiffs launch are challenges to the discretion allowed the decisionmaker in both ordinances regarding the computation of the traffic control fee and the waiver of the 30-day notice fee. *Pls.' Mot. for J. on Liability Issues Based on a Stipulated Record* at 3-4, 25-29 (Docket # 43)(*Pls.' Mot.*).[6] This Court agrees the Plaintiffs have raised a challenge to the statute's reach sufficient to relax the prudential limitations on standing.

This does not end the standing inquiry.  The First Circuit recently noted in *Osediacz v. City of Cranston,* 414 F.3d 136 (1st Cir. 2005): "When certain types of facial challenges to statutes, ordinances, regulations, or governmental policies are premised on First Amendment grounds, they invite a lowering of conventional standing barriers because the traditional jus tertii ban on litigating the rights of third parties is arguably inapplicable…[citing *Forsyth County*]…thus, the lowering of the bar intersects with standing doctrine only on the issue of

[6] Plaintiffs mount a third challenge to the discretion allowed the decisionmaker, regarding the provision in the Parade Ordinance requiring that an applicant meet with the Police Chief and attempt to agree on logistics. *Pls.' Mot.* at 30.  This challenge, while it will be discussed later, is not relevant for purposes of determining justiciability.

9

third-party standing". *Id.* at 140 (emphasis supplied). The Court went on to state; however, that "the Court did not, however, carve out any exception to the core requirements of constitutional standing. These requirements, including the bedrock requirement that the plaintiff…have suffered an injury in fact, were left intact." *Id.* at 141. *See also Munson,* 467 U.S. at 958 ("The crucial issues are whether Munson satisfies the requirement of 'injury-in-fact,' and whether it can be expected satisfactorily to frame the issues in the case. If so, there is no reason that Munson need also be a charity. If not, Munson could not bring this challenge even if it were a charity")(emphasis supplied); *Schaumburg v. Citizens for Better Env't.,* 444 U.S. 620, 634 (1980)("given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court")(emphasis supplied); *Laird v. Tatum,* 408 U.S. 1, 13-14 (1972)(noting, in a First Amendment case, that the federal courts "do not render advisory opinions").

To challenge the MOGO, Plaintiffs must show that they meet the requirements of constitutional standing. While they bear the burden of proof on this issue, *Lujan,* 504 U.S. at 561, the inquiry has been described as "not very demanding". *Osediacz,* 414 F.3d at 143. In *Osediacz,* at issue was a Cranston, Rhode Island policy that allowed private parties to erect holiday displays on the south lawn of City Hall, subject to certain administrative requirements and mayoral approval. 414 F.3d at 137-38. Plaintiff claimed the policy violated the First and Fourteenth Amendments, but the First Circuit, speaking through Judge Selya, concluded she had not shown "some reasonable possibility that she would be subject to the constitutionally defective action". *Id.* at 143. *Osediacz* explained the record must contain "evidence sufficient to

indicate an objectively reasonable possibility that she would be subject to the allegedly unconstitutional mayoral approval requirement". *Id.* at 143.

Here, Plaintiffs' reply motion gives the Court scant reason to conclude that the constitutional as opposed to the prudential requirements of standing, have been met. *See Pls.' Reply* at 3. In their motion, however, Plaintiffs state that "the plain language of the Ordinance unequivocally applies to a march held on a public street in Augusta 'with the intent to attract or with the understanding that the gathering may attract two hundred (200) or more persons'"…the unexplained exercise of discretion by the Augusta Police Department not to apply the City's Mass Outdoor Gatherings Ordinance does not cure the unconstitutional content discrimination set forth in the plain language of the Ordinance itself." *Pls.' Mot.* at 24. If Plaintiffs are correct that the MOGO applies to marches such as the ones that they wished to hold, this could satisfy the "reasonable possibility" that they would be subject to the constitutionally defective action. The City argues the MOGO does not apply to parades. *Def.'s Resp.* at 33-34. In support, Defendant makes two points: (1) the MOGO on its face does not apply to parades; and, (2) even if a "strained reading" could lead to the conclusion that it applied, the City has made it clear it does not. *Id.* Simply put, the City contends a mass gathering is not a parade.

However, the ordinance nowhere defines "mass gathering" and a parade could well meet common definitions of the phrase.[7] More specifically, the City points to the following language in the MOGO:

---

[7] Webster's Third International Dictionary defines "mass" as "participated in, attended by, or affecting a large number of individuals". WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1388 (3d ed. 2002). It defines "gathering" as "a coming together of people in a group (as for social, religious, or political purposes)." *Id.* at 940. There is nothing inherent in the definition of mass gathering that requires it to be stationary; thus, a parade, depending on its size, could be a mass gathering. Presumably, as the City would have it, the difference between a large parade and a mass gathering must be that a parade is moving. The point at which a group of paraders walks slowly enough to become mass gatherers (or vice versa) is something the ordinance does not attempt to define nor is this Court willing to try.

> "Prior to the issuance of a permit under this article, the applicant shall furnish the Police Chief with adequate proof that the following will be available at the gathering:
> (1) The furnishing of adequate and satisfactory water supply and sewer facilities;
> (2) Adequate refuse storage and disposal facilities, adequate medical facilities;…."

Sec. 3-118.  The City contends that "[t]he language of the ordinance, by requiring the applicant to provide the police chief with proof that water and sewer facilities, refuse storage and disposal facilities, and medical facilities were available, demonstrate that the permit requirements do not pertain to people simply walking on the sidewalk, even if more than 200 people are involved." *Def.'s Resp.* at 33.  This Court, however, does not agree this language is so clear to conclude that there is no "reasonable possibility" this ordinance could not cover parades.  Under this language, the City could well require the sponsor of a large parade to provide medical treatment and water for its marchers as well as trash receptacles.  The requirement of sewer facilities (presumably portable toilets) would be less likely, but not out of the question.

The ambiguity of this language is reflected in Major Gregoire's testimony on October 6, 2004.  Responding to whether a large parade was a mass gathering, he stated: "That's – I mean, that's an interpretation.  I don't know.  I would have to review what the ordinance said.  They are moving and that type of thing.  They could be considered a parade.  It's a matter of interpretation".  *Gregoire Dep.* at 5:13-17 (Docket # 56 – Attach. 6).  It is true that Major Gregoire later read the MOGO language unambiguously.   On March 15, 2005 in his supplemental affidavit, he stated:  "the City interprets the Mass Outdoor Gathering permit to only apply to a gathering which occurs at a fixed location".  *Gregoire Supplemental Aff.* ¶ 13; *Resp. to Pls.' Statement of Facts* at ¶ 65 (Docket # 49)(RPSF).

Authoritative limiting constructions by the City are certainly relevant in evaluating the ordinance, *see Ward v. Rock against Racism,* 491 U.S. 781, 795-96 (1989), but this Court finds significant that the City first offered its limiting construction well into this lawsuit - over a year

after Mr. Sullivan's parade application.   As such, this Court cannot consider the City's interpretation to be the kind of "long standing practice" which should guide the interpretation of the ordinance.   *Paulsen v. Gotbaum,* No. 90-Civ.-6152, 1992 U.S. Dist. LEXIS 396, *1 n.1 (S.D.N.Y. Jan. 14, 1992).   Rather, it is an apparently non-binding, non-authoritative statement by the Deputy Chief of Police.[8]   If Major Gregoire changed his mind once, he could do so again. Indeed, the record reflects that from the time the Plaintiffs applied for their permits, there was a reasonable possibility that the City might interpret the MOGO to apply to their conduct.   *See Becker v. FEC.,* 230 F.3d 381, 386 n.3 (1st Cir. 2000)(citing *Lujan* and other case law for the proposition that standing is to be assessed under the facts existing when the complaint is filed). Consequently, in light of Major Gregoire's changing testimony and in the absence of any evidence of a standard long-standing municipal practice, this Court finds the city of Augusta has not adopted an authoritative interpretation of the MOGO so as to eliminate its application to marches or parades.

The Plaintiffs having satisfied the first element of the standing inquiry, i.e. that they were in the class of people potentially chilled by the language of the ordinance and thus suffered an injury in fact, must still show a causal connection between the injury and the conduct complained of, and a likelihood the injury will be redressed by a favorable decision.   The second element requires a "fairly traceable" connection.   *Vt. Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 771 (2000)(citations omitted).   The City argues there is no evidence the Plaintiffs altered their conduct in any way based on the language of the ordinance.   *Def.'s Resp.* at 35.   Nevertheless, one of Plaintiffs' primary complaints involves the lack of a financial

---

[8] In *Ward,* the City had to some extent tied its hands by adopting and formally promulgating a "Use Guideline" as a narrowing construction.   *Id.* at 787.   The Supreme Court found this sufficient, and also cited with approval limiting interpretations offered by "a state court or enforcement agency".   *Id.* at 796 (emphasis supplied).   In contrast, in this case, no external body has offered a narrowing interpretation and the City has not made any attempt to make its own interpretation binding.

hardship exception, as even Defendant admits: "Sullivan's only claim of injury is a claim that he paid too much for the parade permit fee…Dansinger's claimed injury is that…he could not afford the permit fee". *Id.* Both the Parade Ordinance and the MOGO have nearly identical provisions requiring fees for application, traffic control, and clean up costs. Sec 13.5(e); 3-120.[9]

If Plaintiffs had to show that they in fact applied for a MOGO permit to obtain standing to challenge the ordinance, it would not be enough simply to show that they were in the potential class chilled by the MOGO and that the fee provision was an obstacle to speech. Instead, they would be limited to challenging the provisions of the Parade Ordinance – under which they actually applied for a permit and concerning which particular fee requirement they found onerous. However, given that Plaintiffs do not have to show that they in fact applied for a permit, *see Freedman,* 380 U.S. at 56; *Osediacz,* 414 F.3d at 143, their complaint regarding the deterrent effect of a financial hardship exception is fairly traceable not only to the fee provisions of the Parade Ordinance, but to the identical ones of the MOGO.[10] Likewise, striking down the fee provisions of the MOGO would provide some redress to the Plaintiffs' complaint of foreclosed avenues of adequate expression based on financial hardship. *See Pls.' Mot.* at 37 ("The lack of an exemption in both of the City's Ordinances for citizens or groups who would suffer a substantial financial hardship from the permit fees also leaves the plaintiffs and many other Maine citizens and groups without 'open, ample alternatives for communication'"). While the issue is a close one, Plaintiffs have standing to challenge the MOGO.

---

[9] Compare: "the cost of the permit shall be one hundred dollars ($100.00), plus the costs of traffic control per city collective bargaining agreement and clean up costs, as estimated by the Police Department" (Parade Ordinance) with "the fee for a permit under this article shall be one hundred dollars ($100.00), plus the cost estimated by the city for cleanup and traffic control" (MOGO).
[10] For a similar reason, Defendant's argument that because there is no evidence that any one, including the Plaintiffs, has ever applied for a good cause waiver of the thirty-day notice requirement, the provision consequently cannot be justiciable, must fail. *Def.'s Resp.* at 15. In the context of a First Amendment facial challenge, it is not necessary to show the parties actually applied for a permit in order to bring a challenge. *Freedman,* 380 U.S. at 56; *Osediacz,* 414 F.3d at 143.

### B.  Ripeness

The City asserts an additional preliminary matter; namely, that the claims against the MOGO are not ripe because there is no current justiciable controversy.  *Def.'s Resp.* at 35. Ripeness generally involves an evaluation of the fitness of the issue and the hardship of withholding immediate judicial consideration.  *Rhode Island Ass'n of Realtors v. Whitehouse,* 199 F.3d 26, 33 (1st Cir. 1999).  However, when free speech is at issue, the same chilling effect concerns call for a relaxation of ripeness requirements.  *El Dia, Inc., v. Hernandez Colon,* 963 F.2d 488, 496 (1st Cir. 1992)(holding that "a facial challenge of this sort, implicating First Amendment values, customarily works a relaxation of the ripeness criteria"); *Currence v. City of Cincinnati,* No. 00-3985, 2002 U.S. App. LEXIS 1258, *7-*8 (6th Cir. Jan. 24, 2002); *New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1499 (10th Cir. 1995).  The First Circuit has explained that the rationale behind this relaxation stems from fear of irretrievable loss.  *El Dia,* 963 F.2d at 496. *See also Gonzales,* 64 F.3d at 1500 ("First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss.  In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill").

Consequently, when First Amendment claims are presented, "reasonable predictability of enforcement or threats of enforcement, without more, have some times been enough to ripen a claim".  *Id.* at 1499 (citing *Martin Tractor Co. v. Fed. Elec. Comm.,* 627 F.2d 375, 380 (D.C. Cir. 1980).  The standing and ripeness concerns are intertwined, the core being the reasonable fear of enforcement.  *Rhode Island,* 199 F.3d at 29 (citing *Adult Video Ass'n v. Barr,* 960 F.2d 781, 786 (9th Cir. 1992)("Our conclusion that a reasonable threat of prosecution exists, for

purposes of standing, effectively dispenses with any ripeness problem"), *vacated,* 509 U.S. 917 (1993), *reinstated in relevant part,* 41 F.3d 503 (9th Cir. 1994)).   Here, Plaintiffs had a reasonable fear the ordinance would apply to their application.   Therefore, their claims would have been ripe as of that date.   The question is whether the subsequent affidavit by Major Gregoire, stating that the City does not interpret the MOGO to apply to parades, alters this conclusion.

The answer depends on when the ripeness inquiry should be made – at the time of complaint or at the time of decision.   If the latter, Plaintiff's claim may not be ripe; if the former, it is.   Somewhat surprisingly, however, this is hardly a straightforward issue.   *See Rhode Island,* 199 F.3d at 33 (claims "ripe when filed"); *Cmty. Hous. of Me. v. Martinez,* 146 F. Supp. 2d 36, 44 (D. Me. 2001)("the real ripeness issue…is whether rights or obligations had been determined or legal consequences had flowed at the time the amended complaint was filed, when the policy was in force"); *Ctr. for Science in the Public Interest et al. v. FDA,* No. 03-1962, 2004 U.S. Dist LEXIS 20781, at *8 (D.D.C. Sept. 17, 2004)(review conducted on facts existing at the time of the filing of the complaint); *Sierra Club v. Dombeck,* 161 F. Supp. 2d 1052, 1062 (D. Ariz. 2001)(same); *Democratic Nat'. Comm. v. Watada,* 198 F. Supp. 2d 1193, 1197 (D. Haw. 2001); *Bradley v. Work,* 916 F. Supp. 1446, 1464 (S.D. Ind. 1996)(same).   *But see Regional Rail Reorganization Act Cases,* 419 U.S. 102, 140 (1974)("since ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the District Court's decision that must govern"); *Buckley v. Valeo,* 424 U.S. 1, 113-14 (1976)('ripeness is peculiarly a question of timing', and therefore the passage of months between the time of the decision of the Court of Appeals and our present ruling is of itself significant")(citation omitted); *Am. Motorists Ins. Co. v. United Furnace Co.,* 876 F.2d 293, 302 n.4 (2d Cir. 1989)("We note that it is

irrelevant whether the case was ripe for review when the complaint was filed"); *Manley v. Texas,* No. 6-01CV231, 2001 U.S. Dist. LEXIS 25427, at *5-*6 (E.D. Tex. 2001)("whether a case is ripe depends on the state of affairs at the time the court is called upon to render a decision").

This Court concludes that the *Regional Rail* line of authority is distinguishable from this case. In the *Regional Rail* cases, the issue was whether intervening events could make ripe a previously unripe challenge. In contrast, the current concern is whether intervening events can render unripe a previously ripe challenge. Upon analysis, this issue is one of mootness, rather than ripeness. *See Martinez,* 146 F. Supp. 2d at 44 ("HUD also argues that because the policy has been retracted it is not an action by which rights or obligations have been determined, or from which legal consequences will flow. That argument conflates ripeness and mootness"); *Warth v. Seldin,* 422 U.S. 490, 499 n.10 (1975)(defining the ripeness inquiry as turning on "whether the harm asserted has matured sufficiently to warrant judicial intervention" and the mootness inquiry as turning on "whether the occasion for judicial intervention persists").[11] This

---

[11] The City has not argued that Plaintiff's MOGO claim is moot. Nevertheless, this remains an appropriate question. *North Carolina v. Rice,* 404 U.S. 244, 246 (1971)("Although neither party has urged that this case is moot, resolution of the question is essential if federal courts are to function within their constitutional sphere of authority")(*accord Allende v. Shultz,* 845 F.2d 1111, 1115 n.7 (1st Cir. 1988)("Mootness...is a threshold jurisdictional issue which this court may raise *sua sponte*")). This Court cannot conclude solely on Major Gregoire's affidavit that the City is henceforth barred from applying the MOGO to parades. In *Martinez,* Judge Hornby noted:

> The Supreme Court recently reaffirmed the general rule that voluntarily ending a challenged practice after a case is filed does not make the case moot. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 189, 145 L. Ed. 2d 610, 120 S. Ct. 693 (2000). The rule prevents a defendant from evading judgment on the merits of a case by temporarily stopping the challenged practice, only to be "free to return to his old ways" after dismissal. *Id.* (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 97 L. Ed. 1303, 73 S. Ct. 894 (1953)). A defendant can moot a case through voluntary change only if it carries the "heavy burden" of persuading the court that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth,* 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Exp. Ass'n,* 393 U.S. 199, 203, 21 L. Ed. 2d 344, 89 S. Ct. 361 (1968))...In this case, HUD has offered no assurance that it would not reinstate the challenged policy if I were to dismiss the case as moot. Nor am I aware of any legal or practical constraints that would stop HUD from returning to its old ways. To the contrary, HUD abandoned the challenged policy through a swift, informal, and opaque process, and I have no reason to believe that it could not easily reinstate the policy in the same way. If it were to do so, Community Housing would again face the injuries discussed above. Thus, HUD has not satisfied its heavy burden, and Community Housing's claims are not moot.

Court concludes that the proper moment to determine the ripeness of Plaintiffs' cause of action is not now, but the time of the complaint.   Thus, the Plaintiffs' facial challenge to the MOGO is ripe for judicial consideration.[12]

### C.  The Ordinances

Turning at last to the parties' substantive arguments, the first step is to determine what level of scrutiny to apply.   In the world of First Amendment law, the standard of scrutiny depends on content neutrality.   Regulations of speech not regarded as content neutral will be sustained only if they are shown to be narrowly tailored to promote a compelling government interest.   *United States v. Playboy Entm't. Group, Inc.,* 529 U.S. 803, 813 (2000).   Reasonable restrictions on the time, place, or manner of protected speech regarded as content neutral, however, receive "intermediate" rather than "strict" scrutiny.   *Casey v. City of Newport,* 308 F.3d 106, 110-11 (1st Cir. 2002).   *See also Ward,* 491 U.S. at 791; *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 736 (1st Cir. 1995)).

### 1. Content

In *Ward,* the Supreme Court explained that "the principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."   *Ward,* 491 U.S. at 791.   "Thus, a law designed to serve purposes unrelated to the content of protected speech is deemed content-neutral even if, incidentally, it has an adverse effect on certain messages while leaving others untouched."   *McGuire v. Reilly*, 260 F.3d 36,

---

146 F. Supp. 2d at 42-43.  *See also Allende,* 845 F.2d at 1115 n.7 ("Although the specific application of that policy against Allende in March 1983 is moot, the validity of that policy in general remains a live controversy").   Major Gregoire once testified that whether the MOGO applied to parades was a "matter of interpretation."  *Gregoire Dep.* at 5 (Docket # 56 – Attach. 6).  He now says the City does not interpret the MOGO to apply to such events.   Major Gregoire's change of heart hardly inspires confidence that the MOGO could not be interpreted to apply to parades, or that anything prevents the City from doing so in the future.

[12] Even were Major Gregoire's supplemental affidavit considered in this context, given this Court's previous conclusion that it is not an authoritative interpretation, the outcome would be the same.

43 (1st Cir. 2001)(citing *Hill v. Colo.,* 530 U.S. 703, 736 (2000); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47-48 (1986)). The critical inquiry in determining content neutrality is not whether certain speakers are disproportionately burdened, but rather, whether the reason for the differential treatment is, or is not, content-based. *See Hill,* 530 U.S. at 719-20 (positing that a statute is content-neutral when it does not directly regulate speech, or bears a legislative history evidencing its neutrality and is content-neutral on its face, or advances interests unconnected to expressive content). So long as a legitimate purpose unrelated to expressive content can be shown, "all that remains is for the government to show that accomplishment of the legitimate purpose that prompted the law also rationally explains its differential impact." *McGuire,* 260 F.3d at 44 (citing *City of Renton,* 475 U.S. at 47-48; *Nat'l Amusements,* 43 F.3d at 738). *See also McGuire v. Reilly,* 386 F.3d 45, 63 (1st Cir. 2004)(indicating that some showing of discriminatory intent is necessary to make out an as-applied First Amendment viewpoint discrimination claim when legislative motivations were content neutral).

### a. MOGO

The Plaintiffs argue that, on its face, the MOGO impermissibly discriminates in favor of athletic events, because the ordinance exempts all "athletic events conducted by the Board of Education, Little League or other organizations, provided that alcohol is not available." *Pls.' Mot.* at 23 (quoting § 3-122).[13] This Court agrees that the MOGO purposefully provides for content-based differential treatment and is subject to strict scrutiny.

---

[13] In its *Supplemental Mem. of Auth. in Support of Mot. for J. on Stipulated Record* at 5-7 (Docket # 64)(*Def.'s Suppl. Mem.*), Defendant argues that "athletic events" are not protected speech under the First Amendment. Plaintiffs respond that the Defendant has waived this issue, since it was not presented in its earlier responsive brief. *Pls.' Reply to Def.'s Supplemental Mem. of Auth.* at 1 (Docket # 68)(*Reply to Suppl. Mem.*). Plaintiffs are incorrect. At oral argument the parties asked for and this Court allowed supplemental memoranda. The City filed a consented-to motion that allowed the parties to submit supplemental authority "in response to issues raised during argument". *Consent Mot. for Leave to File Mem. of Supplemental Auth. By June 10, 2005* (Docket # 61)(emphasis supplied). Whether athletic events are protected speech was raised during oral argument. Regardless, the issue must fail.

"Athletic events" is a broad label and encompasses a wide range of activity. Concededly, conduct, even expressive conduct, cannot always be dubbed protected speech. *See Spence v. Washington,* 418 U.S. 405, 409-10 (1974). Relevant to this determination is the factual context and nature of the activity (i.e. whether it has "communicative connotations"). Some courts have concluded that athletic activity may be protected speech. *See Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co.,* 510 F. Supp. 81, 86 (D. Conn. 1981)(finding that the exposition of an athletic exercise and the entertainment derived therefrom were "on the periphery of protected speech"). But many others have hesitated to declare that restraints on athletic activity violate the First Amendment. *See Gun Owner's Action League v. Swift,* 284 F.3d 198, 211 (1st Cir. 2002)(concerning an Act prohibiting licensed gun clubs from allowing the shooting at targets with human images on it, finding that "no court has recognized target shooting as a constitutionally protected form of expression", but assuming for the purpose of the content-neutral/content-based analysis that it was expressive content; *Fighting Finest, Inc. v. Bratton,* 898 F. Supp. 192, 195 (S.D.N.Y.1995), *aff'd* 95 F.3d 224 (2d Cir. 1996)(an amateur boxing team composed of police officers failed to present a First Amendment claim when NYPD refused to officially recognize the team); *DeWeese v. Town of Palm Beach,* 812 F.2d 1365, 1366 n.4 (11th Cir. 1987)(refusing to find protection for shirtless jogging); *Allendale Leasing, Inc. v. Stone,* 614 F. Supp. 1440, 1454 (D.R.I. 1985)(state government may ban gambling without impairing First Amendment rights); *Justice v. Nat'l. Collegiate Athletic Assoc.,* 577 F. Supp. 356, 374 (D. Ariz. 1983)(sanctions on a football team not a prior restraint on speech).

The Achilles' heel of the City's ordinance is the breadth of the phrase "athletic events" and its exception for two named and "other organizations". The courts that have concluded the First Amendment does not apply to athletic events have addressed one specific form of athletic activity regardless of the number of spectators. By contrast, the MOGO exempts from a permit requirement any large-scale "athletic event". Plaintiff contends that while "pure athletic activities and games may not be protected by the First Amendment, free speech activities are quite foreseeable at the broader category of an 'athletic event'". *Reply to Suppl. Mem.* at 1-2. *See, e.g., Aubrey v. City of Cincinnati,* 815 F. Supp. 1100, 1102 n.2 (S.D. Ohio. 1993)("we note that many forms of expression are present at various Reds' games"). By exempting "athletic events" from permitting requirements, the City exempts any expression associated with the athletic competition itself. But, the focus of the ordinance is not the athletes, who by themselves will rarely collectively meet the 200 person trigger for the MOGO's application. It must be the spectators who attend the event. What then makes a gathering of 200 plus athletic fans different than other mass gatherings to warrant a municipal exemption? Is it the safety concern? Are athletic fans less rowdy or vociferous, less prone to need medical care, water and sewer facilities, or generally neater than, say, the people in the March for Truth Coalition? If so, the City has produced no such evidence. Instead, the conclusion is inescapable that the City has made this exception based on content. It may be understandable that the City would wish to foster the promotion of athleticism, particularly the support of local athletes. But, this is a choice based on assumptions about the value of athletic events and corresponding assumptions about the value (or lack thereof) of political events. *See R.A.V. v. St. Paul,* 505 U.S. 377, 386 (1992)("The government may not regulate [speech] based on hostility – or favoritism – towards the underlying message expressed").

In addition, there is inherent ambiguity in the phrase "other organizations". Defendant relies on the principle of *ejusdem generis* under which general words following the enumeration of particular classes of things will be construed as applying only to things of the same general class as those expressly listed. *See United States v. McKelvey,* 203 F.3d 66, 71 (1st Cir. 2000); BLACK'S LAW DICTIONARY 535 (7th ed. 1999). It contends the term "other" organization in the athletic event exemption to the MOGO, must be interpreted to refer to other organizations similar to the Board of Education or the Little League; organizations that regularly sponsor youth athletic events. *Def.'s Suppl. Mem.* at 6-7. But, the Little League, despite its iconic status in American culture, is a more complex examplar than meets the eye. First, the Little League has a long tradition of corporate sponsorship and when youngsters emblazoned with the name of a local business take the field, the business has sent a message to the players as well as the parents, grandparents and fans in the stands. Moreover, the advent of national television coverage for the Little League play-offs complete with television ads and play by play announcers has blurred distinctions between the Little League and what could be considered similar organizations. By singling out the Little League, the ordinance opens itself up to a broader range of organizations, which use corporate sponsorship to promote athletic events.

Even applying *ejusdem generis*, there remains an ambiguity as to what organizations would be deemed similar to the Board of Education or Little League. Do the examples of the Board of Education and Little League imply that only athletic events involving minors would qualify? Would an athletic league sponsored the city adult education program qualify? A Police Athletic League (PAL)? A Catholic Youth Organization (CYO)? A Republican or Democratic Party league? To make the decision as to which does and does not qualify, someone in

20

The Supreme Court has held that a restriction on speech is content-based when, like here, the message determines whether the speech is subject to the restriction. *See Arkansas Writers' Project, Inc., v. Ragland,* 481 U.S. 221, 230 (1987).  Accordingly, courts have found ordinances providing similar exemptions to be content-based regulations.  *See, e.g, Hotel Employees & Res. Employees Union, Local 2850 v. City of Lafayette,* No. C-95-3519 SAW, 1995 WL 870959, at *2 (N.D. Cal. Nov. 2, 1995)(exemption for "vehicular wedding or funeral procession" is content-based); *Trewhella v. City of Lake Geneva,* 249 F. Supp. 2d 1057, 1068-69 (E.D. Wis. 2003)(exemption for labor union picketers, school groups, veterans' organizations and governmental agencies is content-based); *Ohio Citizen Action v. City of Avon Lake,* 986 F. Supp. 454, 458-60 (N.D. Ohio 1997)(exemption for individuals "seventeen years of age or younger…soliciting contributions or offering for sale any goods for any religious, charitable, civic, educational or political organization, or…soliciting for a newspaper or something personally manufactured, raised or produced, or…rendering personal services" is content-based).[14]  In contrast, the Supreme Court determined that a permit ordinance covering all types

---

city government must make a judgment about the nature of the organization and the content of its message.  Is it an organization upon which the ordinance (and the City) has placed its imprimatur or an organization it has not and how is that decision to be made without reference to the organization's purpose and message?

This argument addresses only the ambiguity in the phrase "other organization", as applied to the section addressing who conducts the event.  It does not address ambiguity in what an "athletic event" itself could encompass.  A baseball or football game falls within the scope, but events that mix political and athletic activity, so long as they could find a suitable sponsor, could also fall within the ordinance's purview.  What if an elected representative, such as the Governor, threw out the traditional first pitch of a Little League baseball game?  A local church sponsored a field day with the proceeds to support a variety of humanitarian causes?  Legislative staffers put on a tag football game, Rs v. Ds, and charged admission, the proceeds to fund construction of a new Little League field?  The inescapable conclusion is that this ordinance favors organizations and activities the City encourages and there is no way to enforce it without making content-based judgments.  *See Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 230 (1987)("If articles in the Arkansas Times were uniformly devoted to religion or sports, the magazine would be exempt from sales tax…. However, because the articles deal with a variety of subjects (sometimes including religion and sports), the Commissioner has determined the magazine's sales may be taxed…. Such official scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press.").

[14] Some plaintiffs have argued that municipal parade ordinances requiring parade permits, but granting certain exemptions to particular groups, should be held invalid under the Equal Protection Clause.  For example, in *Beckerman v. City of Tupelo*, 664 F.2d 502 (5th Cir. 1981), the Fifth Circuit held that municipal parade ordinances granting licensing and regulatory exemptions to students participating in educational activities and to governmental

of large-scale events—including political and athletic events—at a public park did not discriminate on the basis of content because "none of the grounds for denying a permit has anything to do with what a speaker might say":  the "picnicker and soccer-player, no less than the political activist or parade marshal, must apply for a permit of the 50-person limit is to be exceeded." *Thomas v. Chicago Park District*, 534 U.S. 316, 322 (2002).

The MOGO, on its face, discriminates based on the subject matter of the speech by exempting certain categories of gatherings from the permit requirement.  The MOGO's exceptions regulate on the basis of the subject-matter of the gathering.  The same size event, in the same place, with the same impact – indeed the same people present - so long as the event concerns athletics - is excused from obtaining a permit.  For this reason, the MOGO cannot be considered content-neutral.  *See Dowling v. Township of Woodbridge*, No. Civ.05-313(WGB), 2005 WL 419734, at *5 (D.N.J. Feb. 22, 2005)(exempting certain categories of demonstrations from the pre-registration requirement is a content-based regulation); *N.J. Freedom Org. v. City of N.B.*, 7 F. Supp. 2d 499, 509 (D.N.J. 1997).

Once an ordinance is found not to be content-neutral, it can be upheld only if it is found necessary to serve a compelling state interest and narrowly drawn to achieve that end.  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983); *Playboy*, 529 U.S. at 813 ("If a statute regulates speech based on its content, it must be narrowly tailored to promote a

agencies violated the Equal Protection Clause, as there was no legitimate and important governmental interest furthered by the differential treatment.  The City argued those excepted groups posed less of a security threat than others.  However, the Court pointed out the City had acknowledged the exempted groups disrupted the flow of traffic and emergency vehicles to the same extent as any other group parading through the streets, and posited that the asserted difference had to have been the content of the speech of groups involved in protests, demonstrations, or advocacy posed a greater security risk than traditional groups whose parades tended to be merely festive.  The Court noted that differential treatment of groups based on the content of their speech is unconstitutional. *Id.* at 514.  While the City argued the purpose of this differentiation was to prevent the security risks posed by groups other than those excepted, the Court responded that to uphold this disparate treatment the Court would have to find those parades subject to the ordinance would surely result in direct, immediate, and irreparable damage.  Finding the record entirely devoid of such evidence, the Court concluded the City had classified groups based on the content of their speech without showing any legitimate and compelling interest to justify the differential treatment. *Id.*

compelling Government interest.  If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative").  Such content-based restrictions are "presumptively invalid".  *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382 (1992)(citations omitted).  The justification for the MOGO is as follows:  "It is recognized that a mass outdoor gathering attended by two hundred (200) or more persons may create a hazard to public health and safety.  Accordingly, it is deemed to be appropriate and in the interest of the public welfare to regulate the conduct of such gatherings in order to protect the public health and safety."  Sec. 3-116.[15]  Even if it is conceded that public health and safety are compelling state interests, the City has not put forth any evidence, much less any argument suggesting political or other non-athletic events are more likely to create a hazard to public health and safety than athletic events.[16]  In other words, the City fails to make any showing that the ordinance is either necessary or narrowly tailored.  The MOGO, therefore, fails the strict scrutiny test.

### b. Parade Ordinance

Plaintiffs characterize the permit requirement for marches under the Parade Ordinance as a "prior restraint on speech".  *Pls.' Mot.* at 21.  The City, in contrast, paints the requirement as a

---

[15] In its supplemental memorandum, the City provides an additional content-neutral justification for the exemption, namely that it "advance[s] substantial government interests unrelated to speech (e.g. organized athletics are part of the educational curriculum and foster the physical and mental health and welfare of youth)".  *Def.'s Suppl. Mem.* at 6.  This, however, is not a justification apparent from the face of the statute and there is no evidence this was the justification at the time of the enactment of the ordinance.  The justification, then, hardly meets the test of *Ward*: that the government's purpose behind the adoption of a statute is "the controlling consideration".  491 U.S. at 791.

[16] The City makes only one argument on this point and in passing:  "The City is entitled to subsidize athletic events in the interest of the public good athletics do the community, and is not discriminating against any message Plaintiffs (or anyone else) is attempting to convey by doing so.  The City's effort to promote athletic events is not content-based discrimination against the speech subject to the Mass Outdoor Gatherings Ordinance."  *Def.'s Resp.* at 7 n.2.  This argument tries to draw an analogy between waiving the permit fee (of the Parade Ordinance) for the Maine Chiefs of Police Association and waiving the permit requirement for athletic events in the MOGO.  This analogy cannot stand.  Unlike the parade ordinance, the MOGO discriminates *on its face*.  The Parade Ordinance requires a permit fee of all organizations, and the City chooses to absorb the costs for certain organizations – arguably a subsidy.  In contrast, the MOGO exempts certain organizations from the need to obtain a permit altogether – a content-based distinction.

valid "time, place and manner" restriction.  *Def.'s Resp.* at 1.  The difference between parties'

choice of labels again rests on the content-neutrality of the ordinance.  In *Cox v. State of New*

*Hampshire*, 312 U.S. 569 (1941), the Supreme Court considered the constitutionality of a law

requiring marchers to obtain a license and pay a fee of not more than $300.00 before parading on

public streets.  *Cox* did not characterize that law as a "prior restraint," but rather upheld the law

as a reasonable regulation of the "time, place, and manner in relation to the other proper uses of

streets":

> Civil liberties, as guaranteed by the Constitution, imply the
> existence of an organized society maintaining public order without
> which liberty itself would be lost in the excesses of unrestrained
> abuses.  The authority of a municipality to impose regulations in
> order to assure the safety and convenience of the people in the use
> of public highways has never been regarded as inconsistent with
> civil liberties but rather as one of the means of safeguarding the
> good order upon which they ultimately depend.  The control of
> travel on the streets of cities is the most familiar illustration of this
> recognition of social need.  Where a restriction of the use of
> highways in that relation is designed to promote the public
> convenience in the interest of all, it cannot be disregarded by the
> attempted exercise of some civil right which in other
> circumstances would be entitled to protection.  One would not be
> justified in ignoring the familiar red traffic light because he
> thought it his religious duty to disobey the municipal command or
> sought by that means to direct public attention to an announcement
> of his opinions.  As regulation of the use of the streets for parades
> and processions is a traditional exercise of control by local
> government, the question in a particular case is whether that
> control is exerted so as not to deny or unwarrantedly abridge the
> right of assembly and the opportunities for the communication of
> thought and the discussion of public questions immemorially
> associated with resort to public places.

*Id*. at 574, 576 (citations omitted); *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S.

288 (1984).  However, in cases such as *Forsyth County,* and *City of Lakewood v. Plain Dealer*

*Publishing Co*., 486 U.S. 750 (1988), the Supreme Court analyzed licensing and permit

regulations as "prior restraints," rather than as time, place and manner regulations.  Nevertheless,

the Supreme Court in *Forsyth* noted that local governments may require permits for parades or

rallies to regulate competing uses of public forum. *Forsyth*, 505 U.S. at 130.

The Supreme Court reconciled these seemingly contradictory precedents in *Thomas*.

While the plaintiffs in *Thomas* argued the park-permit ordinance constituted an unconstitutional

prior restraint, the Court rejected a prior restraint formula:

> [T]he licensing scheme at issue here is not subject-matter
> censorship but content-neutral time, place, and manner regulation
> of the use of a public forum.  The Park District's ordinance does
> not authorize a licensor to pass judgment on the content of speech:
> None of the grounds for denying a permit has anything to do with
> what a speaker might say.  Indeed, the ordinance (unlike the classic
> censorship scheme) is not even directed to communicative activity
> as such, but rather to *all* activity conducted in a public park.  The
> picnicker and soccer player, no less than the political activist or
> parade marshal, must apply for a permit if the 50-person limit is to
> be exceeded.  And the object of the permit system (as plainly
> indicated by the permissible grounds for permit denial) is not to
> exclude communication of a particular content, but to coordinate
> multiple uses of limited space, to assure preservation of the park
> facilities, to prevent uses that are dangerous, unlawful, or
> impermissible under the Park District's rules, and to assure
> financial accountability for damage caused by the event.  As the
> Court of Appeals well put it:  "[T]o allow unregulated access to all
> comers could easily reduce rather than enlarge the park's utility as
> a forum for speech."

534 U.S. at 322 (citation omitted).  *See also Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8,

12 (1st Cir. 2004)("The Supreme Court has explicitly rejected attempts to analyze security-based

time-place-manner restrictions as prior restraints…if content-neutral prohibitions on speech at

certain places were deemed prior restraints, the intermediate standard of review prescribed in

time-place-manner jurisprudence would be eviscerated")(citations omitted).  Because the park-

permit ordinance in *Thomas* did not concern itself with the content of the proposed speech, but

rather was a "ministerial, police routine for adjusting the rights of citizens so that the opportunity

for effective freedom of speech may be preserved," the Court upheld the ordinance as a time,

place and manner licensing system. *Thomas,* 534 U.S. at 323 (citing *Poulos v. New Hampshire,* 346 U.S. 395, 403 (1953)).  Under *Thomas,* the crucial difference between the two categories depends on whether the scheme is content-neutral or not and, therefore, in analyzing the parade ordinance, this Court returns to the question of content-neutrality.

Acknowledging the ordinance is content-neutral on its face, the Plaintiffs allege the City has applied the Parade Ordinance in a discriminatory manner by waiving the parade permit fee for the Maine Chiefs of Police Association's (Association) annual parade.  Although the Plaintiffs admit that the waiver of the traffic control fee for the Association's annual parade "is understandable given that the Augusta Police Department is a member organization and it administers the City's parade Ordinance," they contend the waiver constitutes unconstitutional viewpoint discrimination because it favors certain types of speech, such as "pro-police," over other types of speech, such as anti-war. *Pls.' Mot.* at 24-25.  The City counters (1) a government subsidy for certain expressive activities, but not others, is constitutional; and, (2) a viewpoint discrimination claim requires proof of an intent to discriminate against speech because of its content, which is absent here. *Def.'s Resp.* at 7.  The Plaintiffs retort that the City is not merely providing a subsidy for certain types of speech, but placing large financial obstacles against the exercise of speech – a fundamental difference.  Plaintiffs challenge the authority of the City to subsidize speech based on content. *Pls.' Reply* at 5-7.  They also contend the constitutional defect on the City's parade fee can be cured only by eliminating the burdensome fees altogether, or, at the very least, providing a waiver when the fees create a substantial hardship. *Id.* at 6.

The First Amendment guarantee of freedom of speech does not mean that the government must provide funds for or sponsor all speech equally. *Rust v. Sullivan,* 500 U.S. 173, 193 (1991); *Stonewall Union v. City of Columbus,* 931 F.2d 1130, 1138 (6th Cir. 1991), *disapproved on other*

*grounds by Forsyth County,* 505 U.S. at 129.  This prerogative is limited only by the principle that the government may not selectively fund speech on the basis of its viewpoint when subsidizing the speech of private entities.  *Rosenberger v. Rector & Visitors of the University of Va.,* 515 U.S. 819, 834 (1995); *Regan v. Taxation with Representation,* 461 U.S. 540, 548-50 (1983).  For example, the Supreme Court upheld the constitutionality of a subsidy for certain speakers – veterans' organizations – when the distinction was not based on the content or messages of those groups' speech.  *Regan,* 461 U.S. at 548 ("the veterans' organizations…are entitled to receive tax-deductible contributions regardless of the content of any speech they may use").  When the government itself is the speaker, or is using private entities to convey a governmental message, it is entitled to use public funds to do so, regardless of content-neutrality. *Rust,* 500 U.S. at 194; *Rosenberger,* 515 U.S. at 833.

By waiving the permit fee for the annual Association's parade, the City has not maintained or administered the Parade Ordinance to disfavor or suppress one viewpoint in favor of another.  Rather, the City has used its funds to promote and facilitate a speaker deemed to be in the public interest*.  See Long Beach Lesbian & Gay Pride, Inc. v. City of Long Beach*, 17 Cal. Rptr. 2d 861, 879 (Cal. Ct. App. 1993)(holding the use of municipal funds to defray the cost of service charges for certain parades thought beneficial to the city not unconstitutional).  As in *Regan,* it is the speaker rather than the viewpoint that provides the basis for the subsidy. Regardless of the particular message a given march by the Association may convey or be intended to convey to the public and regardless of the content of any such expression, the City has deemed the mere existence of an expressive march by the Association to be in the public interest.  Furthermore, the "Maine Chiefs of Police Association", if not a governmental entity or

a private entity conveying a governmental message, comes close.[17]  Under these principles, there is reason to conclude that the City is entitled to sponsor their speech.

Nor will this Court engage in hair-splitting by finding a constitutional difference between waiving a fee and paying it out of the City treasury.  Either way, the City and more specifically its taxpayers bear the cost.[18]  The permit fee is not discriminatorily applied:  it is "imposed on all, but in some cases paid by the City."  *See id*.  "A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity."  *Harris v. McRae*, 448 U.S. 297, 317 n.19 (1980).  The same issue was presented in *Stonewall Union,* wherein the organizers of a gay rights parade complained about the city's sponsoring and paying the fees of other parades.  The Sixth Circuit, relying on *Harris,* stated:

> [A]lthough plaintiffs have a First Amendment right to parade on behalf of gay and lesbian rights, they do not have a right to demand that the City . . . sponsor that right by paying their parade permit fees because it sponsors other speech-related activities.  If defendants can adequately show that the parades which they have sponsored and for which they have paid the permit fees are reasonably related to the government function which the sponsoring department of the city government performs, the fact that the City . . . sponsors and pays the parade permit fees for certain activities related to government functions does not mean that the ordinance is discriminatorily applied.

931 F.2d at 1138.  Likewise, here, although the Plaintiffs have a First Amendment right to hold a pro-peace and economic justice parade,  they do not have a right to demand that the city of Augusta sponsor that right by paying the parade permit fees simply because it sponsors a speech-related activity closely related to its governmental function.[19]

---

[17] The City is a member of the Association.  *Gregoire Dep.* at 130:15-22.

[18] The City points out the actual cost is much lower for the Chiefs of Police parade, as the cost is shared with the Maine State Police and Capitol Security and the parade is very short.  *Def.'s Resp.* at 9.  Consequently, some of the cost reduction is based on a lower calculation of the cost of traffic control.

[19] Plaintiffs quote the following passage from *Regan*: "although government may not place obstacles in the path of a [person's] exercise of…freedom of [speech], it need not remove those not of its own creation", 461 U.S. at 540, and argue that "unlike *Regan,* here the City is not merely refusing to subsidize the First Amendment activities of the

Since Plaintiffs have failed to show that the Parade Ordinance is anything other than content-neutral,[20] the requirements in the ordinance will be analyzed as time, place and manner restrictions subject to less rigid scrutiny.  In addition to the requirement of content-neutrality, time, place and manner restrictions are constitutional if they:  (1) do not delegate overly broad licensing discretion to a government official; (2) are narrowly tailored to serve a significant government interest; and, (3) leave open ample alternative channels for communication of the information.  *Forsyth County*, 505 U.S. at 130; *Thomas,* 534 U.S. at 323.  The Court will examine each element.

### 2. Discretion

"[E]ven content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression."  *Thomas,* 534 U.S. at 323.  Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk he will favor or disfavor speech based on its content.  *Id*. (citing *Forsyth County,* 505 U.S. at 131).  "The dangers of discretion are particularly evident in parade permit schemes, where waivers will often be sought for politically controversial causes.  It is precisely when 'political and social pressures' are most likely to affect decisionmaking that objective standards to govern discretion are most essential."  *N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984).  Therefore, the Supreme Court requires that permitting requirements contain narrow, objective, and definite standards to guide the licensing authority.  *Forsyth,* 505 U.S. at 131 (citing *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150-51 (1969)).

---

Plaintiff, it is placing substantial obstacles, namely the imposition of large financial fees, in the path of their exercise".  *Pls.' Reply* at 6.  To the extent that Plaintiffs are challenging not merely a refusal to subsidize, but the imposition of permit fees altogether, this argument will be dealt with later in this opinion.  *See supra* III.C.3.c.

[20] Because the City may constitutionally subsidize the Maine Chiefs of Police Association's annual parade without it constituting viewpoint discrimination, it is unnecessary to reach its next argument, based on *McGuire*, that Plaintiffs failed to show any discriminatory intent on the part of legislators, and consequently the claim of viewpoint discrimination should fail.  386 F.3d at 63; *Def.'s Resp.* at 9-10.  It is equally unnecessary to reach Plaintiffs' responsive argument that the cases cited by the City do not apply in "traditional public forums".  *Pls.' Reply* at 6-7.

The Plaintiffs contend that the Parade Ordinance fails this test because (1) there are no written guidelines or formula for determining the number of police officers for traffic control; (2) there are no criteria for determining when there is "good cause" to waive the thirty-day notice requirement;[21] and, (3) the requirement that a parade applicant meet with the Police Chief before the event and "attempt to agree on the details of the route and other logistics" is too vague and subjective. *Pls.' Mot.* at 25-30.

### a. Traffic Control Fee

The Plaintiffs argue that the Augusta Police Department's determination of the estimated cost of traffic control "relies heavily on a judgment call about the number of officers that are required to provide traffic control" because the Police Department "has never established any written criteria or formula for calculating the number of officers or vehicles as part of its estimate of the traffic control cost." *Pls.' Mot.* at 26. Plaintiffs suggest this "broad subjectivity and discretion" is illustrated by the Police Department's increase of "its estimate by twenty percent, from eight to ten, for the number of police officers needed to provide traffic control for the parade route used on April 8, 2003 when the same exact route was proposed for the March 20, 2004 parade." *Id*. at 26-27. They argue the lack of any standards for calculating the number of police officers required for traffic control "magnifies the danger that the police department will impermissibly assign more police officers (and thus charge a higher fee) for traffic control when the proposed parade is controversial and a counter-demonstration or opposition activities are expected." *Id*.

---

[21] MOGO has parallel provisions to the traffic control and good cause waiver sections in the Parade Ordinance. Sec. 3-116(b); Sec. 3-120. Because this Court has held that the MOGO discriminates based on content and fails strict scrutiny, there is no need to address the MOGO under the less onerous time, place and manner standard of review. However, given the similarities between these provisions, the Court notes that its holding on the discretionary provisions of the Parade Ordinance applies to the MOGO as well.

As long ago as *Cox,* the Supreme Court held that a state may require, as a condition to engaging in expressive activity, a permit applicant pay fees to defray policing costs directly attributable to the speech activity. *Cox,* 312 U.S. at 576-77. *Cox* upheld a fee that ranged from "$300 to a nominal amount" and was intended "to meet the expense incident to the administration of the [licensing] act and to the maintenance of public order in the matter licensed." *Id.* Since *Cox,* courts have refined this general rule, subjecting license and fee requirements to closer constitutional analysis.

In *Forsyth County,* the Supreme Court considered a facial challenge to a county ordinance that required permits for private demonstrations and other uses of public property and imposed a fee of up to $1,000 to meet the expense of the ordinance's administration and the maintenance of public order. The Supreme Court found the ordinance unconstitutional because it granted unfettered discretion to the county administrator charged with setting the permit fee, and because the ordinance, by taking into consideration the costs of "necessary and reasonable protection of persons participating in or observing said…activity", arguably based the fee in part on the content of the speech. 505 U.S. at 132-34; *see also City of Lafayette*, 1995 WL 870959, at *4 n.9 (the ordinance granted excessive discretion to the police chief to determine fees where the police chief was required to estimate the city personnel hours necessary to control traffic "or otherwise monitor the special event").

In *Stonewall Union*, the ordinance provided that the following factors must be considered in determining the number of officers necessary for policing a parade:  time, date, route, length, number of participants, and vehicles. 931 F.2d at 1135. Furthermore, a police lieutenant stated by affidavit that the standard criteria used to determine the optimal number of police officers included:  (1) the proposed route and the designated route for the parade; (2) the time of day that

the event is to take place; (3) the date and day of the week proposed; (4) the general traffic conditions in the area requested, both vehicular and pedestrian; special attention given to the rerouting of the vehicles or pedestrians normally using the requested area; (5) the number of marked and unmarked intersections along the route requested, together with the traffic control devices present; (6) if traffic must be completely rerouted from the area, then the number of marked and unmarked intersections and the traffic control devices; (7) the estimated number of participants; (8) the estimated numbers of viewers; (9) the nature, composition, format and configuration of the parade or run; (10) the anticipated weather conditions; and (11) the estimated time for the parade, run or event. *Id*. The Sixth Circuit found the factors to be "objective and definitive standards related to traffic control to guide the licensing authority and prevent unfettered discretion." *Id.*

Here, Major Gregoire stated in his affidavit that the amount of traffic control "is based only on factors which are completely unrelated to the message to be communicated by marchers" and include the route to be taken, the duration of the route, the estimated number of people who will attend, whether marchers intend to close the entire road or only one direction of travel, and whether there are any other events or special circumstances within the City which could affect traffic.[22] *Gregoire Supplemental Aff.* ¶ 6. However, the ordinance, unlike the ordinance in

---

[22] Plaintiffs urge this Court to disregard these factors:

> During discovery in this case, the Plaintiffs attempted to clarify what criteria the City uses to calculate the traffic control fee charged as part of the parade permit. In particular, the Plaintiffs served the following Interrogatory #3: "Identify in as much detail as possible the standards, criteria or formula, if any, used by the persons identified in your answer to question two to calculate the permit fee for the 'March for Peace & Justice' held in Augusta on March 20, 2004." . . . . The City, however, did not disclose the six-factor test cited by its lawyer in the City's March 15, 2004 brief. Rather, the City responded as follows: "The hourly cost for overtime police detail has been established by the City Police Department based on the supervisor's collective bargaining agreement. The hourly rates are standard for all overtime detail. A city map of Augusta is used in the process of determining the traffic costs. The necessary traffic details are determined by Major Gregoire by considering the route taken." That

*Stonewall*, does not explicitly incorporate the objective standards and criteria the Police Chief claims he used when determining traffic control costs.  Sec. 13-5(e)(referring merely to the "costs of traffic control per city collective bargaining agreement and clean up costs, as estimated by the Police Department").  Nor, especially given Major Gregoire's recent elaboration of the criteria in a supplemental affidavit, are these criteria well-established.  The City asks us to assume the Police Chief will consider only these objective factors when assessing the traffic control fee and he will act in good faith and adhere to standards absent from the ordinance.  But this is "the very presumption" the doctrine forbidding unbridled discretion disallows, as "the doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood,* 486 U.S. at 770 (citations omitted).  Here, since the ordinance is silent; it is not the place of this Court to speak for it.  This part of the ordinance is unconstitutional, because the City

---

interrogatory answer was signed by Major Robert Gregoire on July 20, 2004. Similarly, at its deposition on October 6, 2004, the City, speaking officially through Major Gregoire, testified that the Defendant's Answer to the Plaintiffs' interrogatories had been carefully reviewed by him and that he had made sure that "the answers were completely accurate before [he] signed under oath." . . . . At the same deposition, Major Gregoire also testified that he made his estimate of the traffic control cost fee based on his experience and judgment, and he did not disclose any more specific criteria.

*Pls.' Reply* at 7-8.  Plaintiffs contend that, after discovery was completed, the City could not change, without explanation, its sworn answers about the criteria it uses to set the traffic control fee for a parade permit.  *Id*. at 8. Plaintiffs also proffer that the City's sworn answers to the interrogatories and its deposition testimony prove that at least through 2004 the City was not following the six-factor test it now claims to use in setting the traffic control fee, and the "only reasonable conclusion is that the City's claimed criteria are not 'embodied in well-established practice' or otherwise 'definite' enough to pass constitutional muster." *Id*. at 9.

When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not satisfactorily explain why the testimony is changed.  *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)(citations omitted); *Torres v. E.I. Dupont de Nemours & Co.,* 219 F.3d 13, 20-21 (1st Cir. 2000) *LaMarche v. Metropolitan Life Ins. Co.,* 236 F. Supp. 2d 34, 40-42 (D. Me. 2002).  In this case, Major Gregoire's supplemental affidavit does not contradict either his deposition testimony on the issue of the factors applied or the City's answers to interrogatories on the same question.  Although the supplemental affidavit contains additional, more specific factors than those found in Major Gregoire's deposition or in the City's answers, the sworn testimonies are not inconsistent. This Court will consider the six factors set forth in Major Gregoire's supplemental affidavit.  *See Buckner v. Sam's Club,* 75 F.3d 290, 292 (7th Cir. 1996)("supplemental affidavits can be employed to clarify ambiguous or confusing deposition testimony").  This Court agrees, however, that the recent elaboration of this test bears on whether it was part of the City's well-established practice.

has failed to demonstrate its calculations are grounded on the text of the ordinance, binding construction, or well established practice.

### b. Waiver of Thirty-Day Notice Requirement for "Good Cause Shown"

Advance notice provisions "drastically burden free speech." *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994)(citations omitted). The procedural hurdle of filing permit applications and the temporal hurdle of waiting for permits to be granted discourages potential speakers. *Id*. The harms of advance notice requirements are particularly pointed in parade registration schemes: "[T]iming is of the essence in politics. . . . [W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth,* 394 U.S. at 163 (Harlan, J., concurring). A delay "of even a day or two" may be of crucial importance when applied to "'political' speech in which the element of timeliness may be important." *Carroll v. President & Comm'rs of Princess Anne,* 393 U.S. 175, 182 (1968)(quoting *A Quantity of Books v. Kansas*, 378 U.S. 205, 224 (1964)(Harlan, J. dissenting). More specifically, in the context of parades, the Ninth Circuit stated:

> Participatory enthusiasm is vital to their success. The size of a crowd and its enthusiasm for a cause may generate sufficient passion to sway the undecided. Thus, simple delay may permanently vitiate the expressive content of a demonstration. A spontaneous parade expressing a viewpoint on a topical issue will almost inevitably attract more participants and more press attention, and generate more emotion, than the "same" parade 20 days later. The later parade can never be the same. Where spontaneity is part of the message, dissemination delayed is dissemination denied.

*City of Richmond*, 743 F.2d at 1356.

The advance filing requirements that courts have upheld for parades or demonstrations have generally been less than a week. *See, e.g., A Quaker Action Group v. Morton,* 516 F.2d

717, 735 (D.C. Cir. 1975)(two-day advance notice requirement is reasonable for use of National Park areas in the District of Columbia for public gatherings); *Powe v. Miles,* 407 F.2d 73, 84 (2d Cir. 1968)(two-day advance notice requirement for parade is reasonable); *Progressive Labor Party v. Lloyd,* 487 F. Supp. 1054, 1059 (D. Mass. 1980)(three-day advance filing requirement for parade permit approved in context of a broader challenge); *Jackson v. Dobbs,* 329 F. Supp. 287, 292 (N.D. Ga. 1970)(marchers must obtain permit by 4:00 p.m. on day before the march), *aff'd,* 442 F.2d 928 (5th Cir. 1971); *Handley v. City of Montgomery,* 401 So. 2d 171, 183-84 (Ala. Crim. App. 1981)(filing requirements that have the result of requiring applications between four and eleven days before the event, and nine days for the plaintiff, is reasonable given the need for advance planning).

In contrast, advance filing requirements for parade permits for longer periods have been held to violate the First Amendment because municipalities have been unable to demonstrate the need for them. *See Sauk County v. Gumz,* 2003 WI App 165, ¶ 40, 266 Wis. 2d 758, 800, 669 N.W.2d 509, 531 (Wis. Ct. App. 2003)(providing a similar list of authority and concluding that "there is nothing in the record from which we can conclude that forty-five days is a reasonable time period for processing the application or that sixty days is a reasonable filing requirement"); *American-Arab Anti-Discrimination Comm. v. City of Dearborn,* 418 F.3d 600, 605-607 (6th Cir. 2005)(provision requiring thirty days notice is overbroad and is not saved by an unwritten policy of waiving the provision); *Douglas v. Brownell,* 88 F.3d 1511, 1523-24 (8th Cir. 1996)(city's asserted goals of protecting pedestrian and vehicular traffic and minimizing inconvenience to the public does not justify five-day advance filing requirement for any parade, defined as ten or more persons); *City of Richmond,* 743 F.2d at 1355-57 (twenty-day advance filing requirement for parade permit not supported by evidence; police and traffic concerns can be addressed in a much

shorter time period; and research indicated that other municipalities had much shorter time periods); *City of Long Beach,* 17 Cal. Rptr. 2d at 871 (thirty working days); *York v. City of Danville,* 152 S.E.2d 259, 263-64 (Va. 1967)(no evidence that the requirement that the application for a parade permit be made between thirty and sixty days before the proposed event was necessary to prepare for policing of streets or regulation of traffic).

Although the ordinances here provide for a waiver of the thirty-day notice requirement for "good cause shown," *cf. City of Dearborn*, the Plaintiffs argue there are no articulated standards either in the ordinance or in the City's established practice for what constitutes good cause. *Pls.' Mot.* at 29. In its deposition, the City admitted that it had no criteria, written or unwritten, for determining whether to grant a "good cause" waiver of the thirty-day notice requirement. *Gregoire Dep.* at 68:22-69:12. Specifically, Major Gregoire stated: "I just think it's too open to discretion as to when you choose and not choose. You'd have to take it on a case-by-case basis because there are -- I think the major portion of that would be just on what is needed to do the event for personnel." *Id*. at 69:1-5. In his supplemental affidavit, Major Gregoire firmed up his earlier opinion that "if I could provide the people, I could probably provide the event", *Gregoire Dep.* at 69:20-21, by averring, "[a]s long as the Police Department is physically able to contact the officers and make the appropriate arrangements to close the road and have the appropriate traffic officers on duty, the City would not deny the permit based on the timing of the application." *Gregoire Supplemental Aff.* ¶ 18.

By failing to provide standards and guidelines for determining good cause, the waiver provisions convey excessive discretion to the Police Chief to exempt or not to exempt certain applicants from the thirty-day notice requirement. The City's deposition supports the conclusion that the Police Chief has unfettered discretion to grant or deny a waiver. In Major Gregoire's

Supplemental Affidavit, the City attempts to narrow the construction of the waiver provision to save it from constitutional infirmity by establishing a guideline for determining whether to grant a waiver for good cause.  As before, this Court will not read nonbinding criteria into a statute granting unbridled discretion to determine "good cause".  Accordingly, this part of the ordinance is unconstitutional because it invests overly broad discretion in the licensing authority.[23]

### 3.  Overbreadth

The Plaintiffs allege the Parade Ordinance is not narrowly tailored to serve a significant governmental interest - either as applied or on its face.  They say that because the ordinance mandates an applicant meet with the Chief of Police and "attempt to agree" on parade logistics, it is not narrowly tailored on its face.  *Pls.' Mot.* at 32-33.  Also, they claim that because it adds a surcharge for profit when calculating a traffic control fee, the ordinance is overbroad as applied.  *Pls.' Mot.* at 34.  The Plaintiffs also contend that the lack of any exception or reduction to the permit fee for citizens or groups for whom the fee causes a substantial hardship is not necessary to achieve a legitimate governmental interest and, moreover, leaves those citizens and groups without "open, ample alternatives for communication."  *Pls.' Mot.* at 35-37.  Defendant responds that the ordinance is not overbroad, and serves the substantial governmental interest of public safety and traffic control.  *Def.'s Resp.* at 18.

To reiterate, a regulation of the time, place, and manner of protected speech must be narrowly tailored to serve a significant governmental interest and must leave open ample

---

[23] Plaintiffs raise a third argument, arguing the provision requiring parties to meet and "attempt to agree" with the Police Chief on logistics is overly discretionary, allowing the Police Chief to deny a permit for failure to attempt to agree.  Sec. 13-5(c); *Pls.' Mot.* at 30.  The Court agrees with the City that to read discretion into this provision would manufacture an issue where there is none.  The ordinance would hardly be preferable if it <u>required</u> parties to agree on logistics – to agree to proceed as the Police Chief wished, and to pay a fee for the privilege of doing so - and the insertion of the qualifier "attempt" is merely a recognition of that fact.  The ordinance provides that parties must meet with the Chief to discuss and attempt to agree on logistics.  There is nothing that would suggest that the Police Chief has authority to deny a permit based on failure to "attempt to agree", if the meeting is held, and there is no evidence that the City has ever interpreted it as such.  *Def.'s Resp.* at 16-17.

alternative channels for communication.  *Forsyth*, 505 U.S. at 130.  A regulation is narrowly tailored if "the means chosen are not substantially broader than necessary to achieve the government's interest".  *Ward,* 491 U.S. at 800 (*accord Bl(a)ck Tea Soc'y*, 378 F.3d at 12).  To satisfy this benchmark, a regulation need not be the least restrictive alternative available to the government, but must promote a substantial government interest that would be achieved less effectively absent the regulation.  *Ward,* 491 U.S. at 798-99.  Maintenance of public order is a substantial government interest which may under certain circumstances support regulation of the use of public streets for parades.  *See Cox*, 312 U.S. at 574.

As an initial matter, it is indisputable that the Parade Ordinance restricts access to a public forum.  "Public streets are the prototypal example of a public forum."  *City of Richmond,* 743 F.2d at 1355; *see also Hague v. CIO*, 307 U.S. 496, 515 (1939)("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions").  Because the Parade Ordinance restricts access to the streets, it is subject to a particularly high degree of scrutiny.  *City of Richmond,* 743 F.2d at 1355.  Public fora cannot be put off limits to First Amendment activity solely to spare public expense, *see Schneider v. State,* 308 U.S. 147, 162 (1939), nor can laws regulating public fora be held constitutional simply because they leave potential speakers alternative fora for communicating their views.  *See id.* at 163; *City of Richmond,* 743 F.2d at 1355; *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 556 (1974).  "Public fora have achieved a special status in our law; the government must bear an extraordinarily heavy burden to regulate speech in such locales."  *City of Richmond,* 743 F.2d at 1355.

### a.  Meet and Attempt to Agree Provision

The Plaintiffs proffer that the Parade Ordinance's requirement that the applicant must meet with the Police Chief and attempt to agree on parade logistics is not narrowly tailored to serve the significant governmental interests because: (1) requiring an in-person meeting with the Police Chief creates another time barrier to a citizen who is seeking to promote a spontaneous or prompt demonstration in response to a time-sensitive issue or event, especially in the case, as here, where the applicant has already provided specific and detailed information about the requested parade route; and, (2) the details of the route may be an important part of the applicant's expressive activity and therefore the applicant should not be required to negotiate with the government about the manner of expression. *Pls.' Mot*. at 33-34.

It is true that like the advance notice requirement, the in-person meeting provision has the potential to substantially inhibit speech, because one must inform the Police Chief of details about his or her desire to speak. By imposing delay for a meeting with the Police Chief as a condition to permitting a parade, the government inhibits spontaneous expression and thus a certain type of speech. Most significantly, the in-person meeting requirement invites subjective assessments, and applicants who are uncomfortable dealing directly with the Police Chief may be discouraged from applying for a parade ordinance altogether. Plaintiffs' example, of an applicant wishing to protest alleged civil rights abuses by police, is well taken.[24]  *Id*. at 33. Although there is a significant governmental interest in preventing parades from obstructing

---

[24] There are numerous examples. The Chief of Police, after all, is the person the City has charged to investigate crime and enforce the law and the applicant could suffer an understandable reluctance to meet with the Chief, if the parade's message is unconventional, unpopular or stridently anti-authority. For example, if the parade promoter wished to protest current drug laws, a mandatory pre-parade, face-to-face meeting with the Chief of Police could well be a deterrent. But, the most obvious example emanates from the civil rights movement and the Selma March. Judge Frank M. Johnson, Jr. entered a temporary restraining order on March 19, 1965, enjoining then Governor George Wallace and other officials of the state of Alabama from "intimidating, threatening, coercing or interfering with the proposed march…." *Williams v. Wallace,* 240 F. Supp. 100, 109 (D. Ala. 1965). Judge Johnson concluded that the "attempted march alongside U.S. Highway 80 from Selma, Alabama, to Montgomery, Alabama, on March 7, 1965, involved nothing more than a peaceful effort on the part of Negro citizens to exercise a classic constitutional right; that is, the right to assemble peacefully and to petition one's government from the redress of grievances." *Id*. at 105.

traffic and causing other safety concerns, the in-person meeting requirement chills substantially more speech than is necessary to achieve that end.[25]

### b.   Surcharge as Part of Traffic Control Fee

The Plaintiffs also argue that a fee in excess of the amount paid to the police officers for traffic control is overbroad.  *Pls.' Mot.* at 34.  Major Gregoire testified that the City estimates the cost of traffic control before knowing which officers will be available for the overtime needed for a parade traffic control detail; however, he also noted that certain aspects of the process, such as his time to schedule and organize, are not billed.  *Gregoire Dep.* at 102:25-106:23.  The City pays the police officers assigned to the parade a minimum overtime shift of four hours per its collective bargaining agreement.  *Gregoire Supplemental Affidavit* ¶ 8.  Major Gregoire admitted the City "may make some profit" on the traffic control charge depending on which officers work and the "actual cost is less than what we bill".  *Gregoire Dep.* at 98:22-99:3; 166:1-8.  The record shows that the City charged Mr. Sullivan $478.55 more than its actual overtime payments.  PSMF at ¶ 44; RPSF at ¶ 44.  There is no evidence that the difference is equal to or greater than the cost incurred by the City, as Defendants asserts, for "considerable administrative and overhead time".  RPSF at ¶ 44; *E. Conn. Citizens Action Group v. Powers,* 723 F.2d 1050, 1056 (2d Cir. 1983), *questioned on other grounds as stated in Van Arnam v. GSA,* 332 F. Supp. 2d 376 (D. Mass. 2004).

Ordinarily, a government cannot profit by imposing licensing or permit fees on the exercise of a First Amendment right.  *Murdock v. Pennsylvania,* 319 U.S. 105, 113-14 (1993); *Cox,* 312 U.S. at 577.  Only fees that cover the administrative expenses of the permit or license are permissible.  *E. Conn. Citizens Action Group*, 723 F.2d at 1056; *Nat'l Awareness Found. v.*

---

[25] This opinion does not affect the citizen who wishes to meet with the Chief of Police to resolve any logistical or other issues.  The problem is the mandatory nature of the meeting.

*Abrams,* 50 F.3d 1159, 1165 (2d Cir. 1975).  *See also Cox,* 312 U.S. at 577 (approving of a fee "limited to the purpose stated" of meeting "the expense incident to the administration of the Act and to the maintenance of public order in the matter licensed"); *Northeast Ohio Coal. v. City of Cleveland,* 105 F.3d 1107, 1110 (6th Cir. 1997)("license or permit fee…does not violate the Constitution so long as the purpose of charging the fee is limited to defraying expenses incurred…").  A fee in excess of the amount necessary to offset these costs is impermissible.  *E. Conn. Citizens Action Group*, 723 F.2d at 1056; *Moffett v. Killian*, 360 F. Supp. 228, 232 (D. Conn. 1973)(holding that Connecticut cannot collect a fee in excess of that amount "actually needed" to defray the costs of administering legitimate regulation of First Amendment activity).[26]  In contrast to this Court's earlier conclusion that "the record establishes that the police fee is simply a mathematical computation based on the Police Chief's assessment of the police presence necessitated by the parade route", *Sullivan,* 310 F. Supp. 2d at 354, further discovery has revealed that the computation does not bear a direct or precise relationship to the actual costs incurred.  It is, therefore, overbroad.[27]

### c.  Disparate Impact on the Indigent

The Plaintiffs contend the ordinances are unconstitutional on their face and as applied because they do not provide any exception or reduction to the large permit fee for citizens or

---

[26] Outside the Eleventh Circuit, there is very little support for Plaintiffs' position that the fee must be nominal, *Pls.' Mot.* at 35, nor is that position in line with *Cox.  See Stonewall Union,* 931 F.2d at 1136 ("Plaintiffs argue that under the First Amendment only a nominal fee may be charged for a parade license and the Columbus ordinance is unconstitutional because it does not limit charges to nominal amounts.  Plaintiffs rely on [*Cent. Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515, 1523 (11th Cir. 1985)] for this proposition, but we believe this case misreads *Cox* as permitting only nominal charges for policing a parade.  The fee approved in *Cox* was not nominal, but instead ranged 'from $300 to a nominal amount.'  312 U.S. at 576."); *Forsyth,* 505 U.S. at 136-37 (examining *Murdock* and *Cox* and noting *Murdock* "does not mean that an invalid fee can be saved if it is nominal, or that only nominal charges are constitutionally permissible.  It reflects merely one distinction between the facts in *Murdock* and those in *Cox.*").

[27] In *Cent. Fla. Nuclear Freeze Campaign,* the Eleventh Circuit determined that the "charging of overtime payment for police salaries is not the least restrictive means of achieving the governmental concerns of protecting the public safety", as a city could use reasonable alternatives, such as "reserve police officers, who are not entitled to contractual overtime pay", to keep costs down.  774 F.2d at 1526.

groups for whom the fee causes a substantial hardship. They argue the lack of a financial exemption burdens more expressive activity than necessary and leaves those citizens and groups unable to pay the fee without "open, ample alternatives for communication." *Pls.' Mot.* at 35-37.

The ordinances do not take into account the ability of the applicant to pay the fee. Nor does the evidence indicate that the Police Chief, in his or her discretionary capacity of assessing the total permit fee, considers the ability of the applicant to pay such fee. PMSF at ¶ 55. Although the City's permit schemes provide for a review of a denial of a permit before the City Council, *see* Sec. 13-5(g), there is no provision that exempts persons, who are unable to pay, from paying the costs for police protection. The granting of a permit on the basis of the ability of persons to pay an unfixed fee for police protection, without providing for an adequate alternative means of exercising First Amendment rights, is unconstitutional. *Murdock*, 319 U.S. at 111 ("Freedom of speech, freedom of press, freedom of religion are available to all, not merely to those who can pay their own way.").

In *Van Arnam,* a case involving an organization wishing to protest on JFK Plaza in Boston, Judge Woodlock held that, "although Van Arnam is not 'indigent,' acceptance of the *ex ante* financial burden of a $1,000 (or greater) insurance premium, or the more diffuse (but potentially far greater) burden of unlimited personal liability, would be a serious financial burden for her - one that could (and in fact did) completely deter her from speaking on federal property." 332 F. Supp. 2d at 406. He concluded that the indemnification clause imposed financial demands that burdened the expressive activities of those without sufficient financial means more than necessary to achieve legitimate governmental interests. *Id.*

Other courts have found that indigent persons are denied an equal opportunity to be heard if as a consequence of the added costs of police protection, they are unable to pay the charge for

exercising their First Amendment rights. *Cent. Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515, 1523-24 (11th Cir. 1985)(holding city ordinance unconstitutional in part because there was no provision exempting indigents from paying the costs for additional police protection); *Invisible Empire of the Knights of the Ku Klux Klan v. Town of Thurmont,* 700 F. Supp. 281, 286 (D. Md. 1988)(requirement of reimbursing town for police protection and cleanup was unconstitutional because it was not "waived or modified for indigents"); *Wilson ex rel. U.S. Nationalist Party v. Castle,* No. 93-3002, 1993 WL 276959, at *4 (E.D. Pa. July 15, 1993)(insurance requirement was not narrowly tailored as applied to persons "who are financially and otherwise unable to obtain coverage"); *Invisible Empire Knights of the Ku Klux Klan v. City of West Haven*, 600 F. Supp. 1427, 1435 (D. Conn. 1985)(bond requirement was unconstitutional as applied to those who can demonstrate their inability to obtain a bond).

However, some courts have held the mere absence of an indigency exception is not fatal, particularly if the failure to prepay the additional police charges does not preclude the applicants from engaging in the constitutionally protected activity. *Stonewall Union,* 931 F.2d at 1137. In *Stonewall Union*, the Sixth Circuit concluded an indigency exemption or waiver was not required for a parade ordinance when the sidewalks and parks of the city were available without charge for related speech activities. *Id.* Likewise, in *Sauk County,* the court reviewed an ordinance that required a license for large assemblies (over 1,000 people) lasting more than eighteen hours and agreed with *Stonewall Union*, holding that the plaintiff had ample alternative means of assembling and speaking to express his views. *Sauk County* noted that the plaintiff provided it with no "authority that persons are constitutionally entitled to hold a gathering of the size and duration covered by this ordinance if they are unable to pay for reasonable costs associated with

the application for a license or the assembly itself, when those charges for the costs are imposed without regard to the content of speech."  2003 WI App. 165 at ¶ 57.[28]

At issue here is whether the sidewalks and parks of a city represent a reasonable alternative to parades.  When evaluating whether there are open, ample alternatives, the First Circuit has reminded us that "the lens of inquiry must focus not on whether a degree of curtailment exists, but on whether the remaining communicative avenues are adequate".  *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n.,* 100 F.3d 175, 193 (1st Cir. 1996)(quoting *Nat'l. Amusements,* 43 F.3d at 745).  Furthermore, "the First Amendment does not guarantee a right to the most cost-effective means of distribution or the rent-free use of public property" and "some diminution in the overall quantity of speech" may be tolerated when evaluating whether or not there are adequate alternatives.  *Id.* at 193-94.

The City claims there are several adequate alternatives available to Plaintiffs and others without financial means, including: sidewalk marches, rallies on the State House steps, and mass gatherings.  *Def.'s Resp.* at 5.  This Court has carefully considered *Stonewall Union* and progeny, but ultimately reaches the opposite conclusion.  The Plaintiffs developed a persuasive argument, based on the expert opinions of Joe H. Bandy, III, an Assistant Professor of Sociology at Bowdoin College, underpinning their position that the ordinances do not adequately allow for alternative means of effectively communicating their message.[29]  According to Assistant

---

[28] In addition to legal arguments, Defendant claims an indigency exception would be "unworkable in practice and bad policy", as "virtually any group could find an indigent person to sponsor an event", making it an exception which swallows the rule.  *Def.'s Resp.* at 30.  An exception would also raise problems of intrusive and complex evidentiary inquiries and line-drawing, and would force City taxpayers to fully subsidize speech by paying for the police resources necessary to close the streets to traffic.  *Id.* at 31-32.  This Court is skeptical of the City's parade of horribles, given that it has found other fee waiver policies practicable, albeit on a much smaller scale.  PMSF ¶¶ 57-58; *Dep. of Leif Erik Dahlin* (Docket # 56 – Attach. 5).  Further, literally thousands of determinations of indigency are routinely and daily made in the administrative agencies and courts of this country.  The question is not so much whether the exception would swallow the rule, but whether the rule would swallow the right.

[29] Assistant Professor Bandy has special expertise in the study of social movements and bases his opinions on "his knowledge of the writings and findings of other experts in the study of social movements, and his own research and

Professor Bandy, there are several reasons a march offers advantages over more stationary forms of expression: (1) a moving march allows demonstrators to bring their protest message to a variety of different audiences; (2) a march may more greatly inconvenience the general public [by, for example, blocking streets] and therefore be more likely to gain the attention of media; (3) a march has positive connotations because of the American tradition of successful marches, such as the 1963 March on Washington; and, (4) the march is more effective at promoting camaraderie and movement-building. *See* PSMF at ¶¶ 4-7.

Besides having less symbolic significance, sidewalk marches are an inadequate substitute for logistical reasons. The demonstration would be narrower, which would not allow for wide placards or banners to be carried and may make the march look smaller. The procession's narrowness may dampen camaraderie by preventing people from marching side-by-side with a critical mass of fellow protestors. A sidewalk march would not interrupt traffic and disrupt routines, and would likely not garner as much attention. *See* PSMF at ¶¶ 9-12.[30] To the extent the march interrupts traffic (i.e. when marchers were forced to cross intervening streets), the march would be less safe than a parade where traffic is stopped and there is a police presence. Safety concerns may deter some would-be participants. *Pls.' Reply* at 16. Moreover, the march

---

experience as a scholar in the field". PSMF at ¶¶ 1-2. The City objects to Assistant Professor Bandy's opinions on several grounds: (1) he has no training or qualifications in specifically assessing the impact of any particular parade ordinance, and more specifically, the city of Augusta's ordinances; (2) his opinions "go to an issue not in dispute in this case, whether it is good policy to give parades/street marches First Amendment protection"; (3) he does not have sufficient qualifications to offer some of his opinions; and (4) several of his opinions are not "an appropriate subject for expert testimony". RPSF at ¶¶ 1-12. This Court has already determined that whether a sidewalk or rally is an acceptable alternative to a street parade presents a proper issue. Further, the study of social movements is recognized by the American Sociological Association as a subspecialty, which implies that opinions on social movements are appropriate matters for expert testimony, even if laymen also may have opinions on the subject. *Dep. of Joe Bandy* at 7-8 (Docket # 56 – Attach. 3). Assistant Professor Bandy has a Ph.D in sociology, and social movements are his specialty area. *Id.* He is qualified to provide opinions on the issue of the effectiveness of methods of protest, and his opinions "assist the trier of fact to understand or determine a fact in issue". *Ruiz-Troche v. Pepsi-Cola of Puerto Rico Bottling Co.,* 161 F.3d 77, 80 (1st Cir. 1998). Therefore, this Court has examined Assistant Professor Bandy's opinions on the effectiveness of various forms of social expression.

[30] The City argues that since a sidewalk march is visible to passing motorists, it is <u>more</u> likely to get a message out to the public than a parade in which streets were blocked off. RPSF at ¶ 10. This could be true, but passing motorists are not the sole or necessarily the primary persons to whom the message of a parade is commonly directed.

might be forced to halt altogether to let traffic pass.  *Pls.' Reply* at 17.  Finally, despite the City's proffer of a sidewalk march as a reasonable alternative, the Parade Ordinance arguably applies to sidewalk marches, since its permit requirements encompass the "use of public ways within the city".  Sec. 13-5(a); *Pls.' Reply* at 18.[31]

This Court finds support for Plaintiffs' position in the line of authority holding that public streets are traditional public fora and that "the government must bear an extraordinarily heavy burden to regulate speech in such locales."  *City of Richmond,* 743 F.2d at 1355.[32]  More specifically, since "the streets are natural and proper places for the dissemination of information and opinion…one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place".  *Schneider,* 308 U.S. at 163. Because Plaintiffs have set forth a compelling case, supported by expert testimony, as to why Defendant's proffered alternatives are inadequate for expressive purposes, because the sidewalk march is at least arguably covered by the language of the Parade Ordinance, and finally, because of the importance accorded freedom of speech in traditional public fora, this Court concludes that the Parade Ordinance does not provide open and ample alternatives for communication.  To block indigents from using the public streets to convey their message, by pointing out channels of communication that may be used free of charge, but are inadequate, is unconstitutional.  It is the equivalent of a determination that those who cannot afford to pay the fee either have a less important message to convey or must convey it in a less effective way.  Consequently, the Parade Ordinance must afford a fee waiver for those unable to pay.

### D.  Final Considerations:  Abstention and Saving Constructions

---

[31] Defendant asserts that the Parade Ordinance would not apply to a sidewalk march.  *Def.'s Resp.* at 5; *Gregoire Supplemental Aff.* ¶¶ 10, 22.  However, by its terms, the ordinance applies to "an intended parade, march, or other use of a public way", § 13-5(a), and the City admitted a sidewalk is a public way.   PSMF at ¶ 64; RPSF at ¶ 64.
[32] *See* discussion *supra* section III.C.3.

This Court does not lightly declare unconstitutional the provisions of a duly-enacted municipal law.  The citizens of the city of Augusta have a right through their elected representatives to order their affairs to minimize the impact of parades and marches on those citizens who are not participants and to maintain civic safety and order.  Further, to the extent the City will be required to provide police protection for those marchers who cannot afford to pay, the financial onus of securing the First Amendment rights of their fellow citizens falls disproportionately upon the citizens of Augusta.  It is also true that although the protections of the First Amendment apply with equal force throughout this country and state, the citizens of a capital city, as the seat of governmental authority, are more likely to be subject to public challenges to the exercise of that power.  This Court is obligated to determine whether it should avoid the constitutional issue by abstaining and allowing the state courts to interpret the provisions in a manner that could save them or alternatively to do so itself.  Ultimately, however, the obligation to enforce the freedoms of the Bill of Rights applies with special force to the federal courts and to shirk this duty would itself be to violate the Constitution this Court is sworn to uphold.

Abstention or certification may be proper to "save" a state law by allowing state courts the opportunity to give the challenged statute a definitive and potentially constitutional construction.[33]  *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 575-76 (1989).  However, as elaborated by *Jews for Jesus*, this doctrine is not always applicable, particularly when the resolution is not "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question".  *Id.* at 375.  *See also White v. Edgar,* 320 A.2d 668, 675 (Me. 1974)("That the State statute under attack…may reasonably be deemed

---

[33] Neither party moved for certification; however, Rule 25(a) allows this Court to submit a certified question to the Law Court "upon its own motion or upon request of any interested party."  Me. R. App. P. 25(a).

susceptible of a limiting construction by the State Court which will avoid, or modify, the federal constitutional issue has long been recognized to warrant federal abstention").[34]   Crucial to the application of abstention is whether the state law is ambiguous in some material way or whether it presents difficult questions of state law.  *See Dionne v. Bouley,* 583 F. Supp. 307, 310-11 (D.R.I. 1984)(citations omitted).   However, the First Circuit has stated that "a vagueness challenge to a state law does not call for abstention; a plaintiff is entitled to the forum of his choice".  *Wishart v. McDonald,* 500 F.2d 1110, 1114 (1st Cir. 1974).

This Court has found unconstitutional the 30-day notice requirement found in section 13-5(a)("No less than thirty (30) days prior to an intended parade, march or other use of public ways within the city, a permit must be applied therefore…The City Manager may allow a shorter time frame for good cause shown") and 3-116(b)("The application… must be submitted no less than thirty (30) days prior to the mass gathering, unless the City Manager allows a shorter time frame for good cause shown"), on the grounds that thirty days is far broader than necessary to meet the City's purposes and there are no standards in the ordinance regarding when the thirty-day limit may be abandoned.  *See infra* III.C.2.b.  The thirty-day requirement is as clear as day, and presents no ambiguity which would require the assistance of an authoritative interpretation by the Maine Law Court.  Consequently, the provision must be stricken, not saved.

Similarly, to avoid constitutional infirmity, the Maine Law Court would have to construe the ordinance's "good cause" provisions in §§ 13-5(a) and 3-116(b) so as to avoid discretionary rulings based either on the message or the messenger.  However, in Maine, as elsewhere, good cause typically refers to determinations that are highly contextual, fact intensive and discretionary.  *See, e.g.,* Me. R. Civ. P. 5(g)(2) (good cause for accepting filings made after hours

---

[34] In *White,* the Maine Law Court noted it had jurisdiction to respond to a certified question of state law "one alternative answer to which, as the answer forthcoming from this Court, will produce a final disposition of the federal cause".  *Id.* at 676.

or for other courts); Me. R. Civ. P. 16 (good cause for modification of pre-trial and scheduling orders); Me. R. Civ. P. 16B(b)(9)(good cause exemptions from alternative dispute resolution); Me. R. Civ. P. 26(c)(good cause for protective orders); Me. R. Civ. P. 35(a)(good cause for physical or mental examination); Me. R. Civ. P. 41(b)(good cause for avoidance of involuntary dismissal); *Kingsbury v. Forbes,* 1998 ME 168, ¶ 4, 714 A.2d 149, 150-51 (construing same, noting that "[w]e have stated that 'good cause' is a flexible concept and its application requires the trial court to consider 'the circumstances of each individual case and then to make its determination by exercising a sound discretion'"); *Emerson v. A.E. Hotels, Inc.,* 403 A.2d 1192, 1193 n.2 (Me. 1979)("'Good cause' is a highly relative concept.  It lacks fixed and definite meaning…"); Me. R. Civ. P. 55(c)(good cause for setting aside default); *Ireland v. Carpenter,* 2005 ME 98, ¶ 13; 879 A.2d 35, 39 (defining same)(citation omitted); Me. R. Civ. P. 59(c)(good cause for extension of time to serve affidavits); Me. R. Civ. P. 69 (good cause for execution of judgment); 10 M.R.S.A. § 1174 (good cause for automobile dealership franchise relationship modifications and terminations).  To construe the "good cause" provision of this ordinance to avoid its infirmity, the Maine Law Court would be required to act as a legislature and infuse into the provision a host of permissible and impermissible criteria, a construction that would run against its prior constructions of the phrase "good cause".  This Court concludes this phrase is not susceptible to a limiting construction that is likely to avoid the federal constitutional infirmity.

This Court has also declared that the requirement in section 13-5(c) that the applicant "meet with the Police Chief to discuss and attempt to agree on the details on the route and other logistics", *see infra*  III.C.3.a, violates the First Amendment because of the potentially chilling

effect such a meeting could have on speech.  Again, this provision presents no ambiguity subject to a limiting construction by the Maine Law Court, and must be stricken, not saved.

A more difficult question is presented by § 13-5(e) and § 3-120.  Section 13-5(e) allows the imposition of the costs of police protection but provides no criteria for how those costs are to be assessed other than its reference to the city's collective bargaining agreement.  Likewise, § 3-120 allows the imposition of the cost "estimated by the city for cleanup and traffic control" without any criteria for how these costs will be estimated.  The City contends that Major Gregoire's testimony amounts to a saving construction by adopting the *Stonewall Union* factors as an authoritative interpretation.  This Court has rejected the City's position on this record.  But, to presume the Maine Law Court would or this Court should so construe § 13-5(e) to silently infuse criteria set forth in a 1991 Sixth Circuit case would be in derogation of the Augusta City Council's right to enact its own ordinances in a manner consistent with the law.  Had Major Gregoire interpreted an ambiguous statute, this might present a proper opportunity to abstain or certify the matter to the Maine Law Court.  But the statute, though terse, is unambiguous.  *See Dionne,* 583 F. Supp. at 311 ("…Indeed, the Court finds the relevant statutes to be admirably free of ambiguity").  As such, to abstain or refer the matter would serve no purpose of comity, and would waste the plaintiffs', the defendant's, and the Law Court's time.  *See id.* at 310.

Finally, as regards the exemption in § 3-122 for "athletic events conducted by the Board of Education, the Little League or other organizations", this Court is unconvinced that there is any construction of this provision that could save it.  Hence, this clause too must be stricken.

**IV.  CONCLUSION**

Plaintiffs' Motion for Judgment on Liability Issues Based on a Stipulated Record (Docket # 43) is GRANTED.  Defendant's Cross-Motion for Judgment is DENIED (Docket # 48).  This Court ORDERS the following:

1.  Section 13-5(a) of the Parade Ordinance and Section 3-116(b) of the MOGO violate the First Amendment and are unconstitutional to the extent that each requires thirty (30) days' prior notice and a shorter time frame only for "good cause" shown.

2.  Section 13-5(c) of the Parade Ordinance, to the extent that it requires an applicant to "meet with the Police Chief to discuss and attempt to agree on the details on the route and other logistics", violates the First Amendment and is unconstitutional.

3.  Section 13-5(e) of the Parade Ordinance and Section 3-120 of the MOGO, to the extent that there is no provision allowing for a waiver of fees for indigents, violate the First Amendment and are unconstitutional.  Also, the city's current method of calculating the payment of costs of traffic control and clean up by the applicant violates the First Amendment and is unconstitutional.

4.  Section 3-122 of the MOGO, providing an exemption for athletic events "conducted by the Board of Education, Little League or other organizations, provided alcohol is not available" violates the First Amendment and is unconstitutional.

**SO ORDERED.**

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of December, 2005