UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| TIMOTHY SULLIVAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV-04-32-B-W |
| | ) | |
| CITY OF AUGUSTA, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR ATTORNEY FEES**

Freedom has a price.  The Plaintiffs were successful in a lawsuit against the city of Augusta, and the First Circuit declared unconstitutional several significant provisions of the City's parade ordinance.  The Plaintiffs claim from the City a total of $121,751.44:  $115,751.44 in attorney fees and expenses for their success on the merits, and an additional $6,000 for their pursuit of this award of attorney fees.  Using historic instead of 2008 hourly rates, subtracting fees and expenses attributable to issues on which they did not prevail, and calculating fees and expenses attributable to issues on which they did, the Court awards Plaintiffs $83,264.78: $77,264.78 in fees and expenses for their success on the merits and $6,000 for their pursuit of fees.

I.      **STATEMENT OF FACTS**

A.      **The Motion for Award of Attorney Fees**

Under federal law, if a plaintiff prevails in a lawsuit against the government that vindicates constitutional rights, the plaintiff is entitled to reasonable attorney fees as part of the costs.  42 U.S.C. § 1988(b).  On March 15, 2004, Timothy Sullivan filed a lawsuit under 42 U.S.C. § 1983 against the city of Augusta, Maine, claiming that certain provisions of the City's

ordinances violated his First Amendment rights.[1]  *Compl.* (Docket # 1).  On December 14, 2007, the Court of Appeals for the First Circuit issued an opinion that affirmed some, but not all the Plaintiffs' constitutional claims.  *Sullivan v. City of Augusta*, 511 F.3d 16 (1st Cir. 2007).  On November 26, 2008, the Plaintiffs moved for an award of attorney fees and expenses in the total amount of $115,751.44.  *Pls.' Mot. for Award of Att'y's Fees and Litigation Expenses* (Docket # 83) (*Pls.' Mot.*).  Taking the position that "either no fee, or a drastically reduced fee, is appropriate," the City objected.  *Def.'s Opp'n to Pls.' Mot. for Award of Att'y's Fees and Litigation Expenses* at 1 (Docket # 95) (*City's Opp'n*).  The Plaintiffs replied and requested an additional $6,000 in fees attributable to their pursuit of fees.  *Pls.' Reply in Support of Mot. for Award of Att'y's Fees and Litigation Expenses* (Docket # 98) (*Pls.' Reply*).  The City sur-replied.[2]  *Def.'s Surreply to Pls.' Reply in Support of Mot. for Award of Att'y's Fees and Litigation Expenses* (Docket # 104) (*City's Sur-Reply*).

**B.**   ***Sullivan v. City of Augusta***

**1.**     **The Motion for Temporary Restraining Order**

Along with his March 15, 2004 Complaint, Timothy Sullivan filed a motion for temporary restraining order against the city of Augusta, alleging that the ordinances controlling parades and mass gatherings placed unconstitutional burdens on the exercise of First Amendment rights.  *Compl.* ¶¶ 1-2; *Pl.'s Mot. for TRO* (Docket # 2).  On March 17, 2004, the City responded and urged the Court to "deny the motion."  *City of Augusta's Mem. in Opp'n to Pl.'s Mot. for TRO* at 1 (Docket # 7).  On March 19, 2004, the Court issued an Order, granting in part and

---

[1] Mr. Sullivan was initially the sole plaintiff.  *Compl.* ¶ 2.  On August 25, 2004, the Plaintiff moved to amend the Complaint and to join Lawrence Dansinger as an additional Plaintiff.  *Pl.'s Mot. to Join Additional Pl. and File First Am. Compl.* (Docket # 26).  The Court granted the motion on September 16, 2004.  *Order* (Docket # 27).

[2] Premised on the proposition that there has to be an end to all arguments, the Local Rules do not provide for sur-reply.  Here, the Magistrate Judge granted the City's unopposed motion for sur-reply, because contrary to Local Rule 7(c), the Plaintiffs raised new issues in their reply, one of which was the additional request for attorney's fees.  *Order* (Docket # 103); D. Me. Loc. R. 7(c) (providing that a reply memorandum "shall be strictly confined to replying to new matter raised in the objection or opposing memorandum").

denying in part the motion for temporary restraining order. *Order Regarding Pl.'s Mot. for TRO* (Docket # 12).[3]  The Court granted the motion regarding the City's bond requirement on the ground that it delegated excessive discretion to the Chief of the Augusta Police Department. *Id.* at 2.  In all other respects, however, the Court denied the motion. *Id.*

### 2. The Motions for Judgment on Liability and the Court Order

On January 20, 2005, the Plaintiffs moved for judgment on liability based on a stipulated record. *Pls.' Mot. for J. on Liability Issues Based on a Stipulated R.* (Docket # 43).  In the motion, the Plaintiffs asked:

(1) That the Court hold that sub-sections (a) and (c) of the City's Parade Ordinance § 13-5 violate the First Amendment on their face and as applied and enjoin the City permanently from enforcing them;

(2) That the Court hold that sub-section (e) of the City's Parade Ordinance § 13-5 violates the First Amendment on its face and as applied to applicants for whom the fee requirements would create a substantial hardship because of their limited financial means;

(3) That the Court hold that the City's Mass Outdoor Gathering Ordinance (MOGO) violates the First Amendment on its face because of the content discrimination established by § 3-122 and the inflexible thirty-day advance notice requirement in § 3-116(b); and,

(4) That the Court hold that the permit fee in § 3-120 of the City's MOGO violates the First Amendment on its face and as applied to applicants for whom fee requirements would create a substantial hardship because of their limited financial means.

---

[3] *Sullivan v. City of Augusta* (*Sullivan I*), 310 F. Supp. 2d 348 (D. Me. 2004).

*Id.* at 38.  The City responded, urging the Court to "deny to Plaintiffs any relief and enter a judgment in favor of Defendant."  *Def.'s Resp. to Mot. for J. on Liability, and Cross-Mot. for J. on Liability* (Docket # 48).  On December 22, 2005, the Court issued an Order, which granted the Plaintiffs' motion and denied the City's cross-motion.  *Order on Mots. for J. on Liability* (Docket # 69).[4]  The Court concluded:

(1) That the City had charged Mr. Sullivan $478.55 more for traffic control than its actual overtime payments and that this charge was unconstitutional;

(2) That § 13-5(a) of the Parade Ordinance and § 3-116(b) of the MOGO violate the First Amendment and are unconstitutional to the extent that each requires thirty (30) days prior notice and a shorter time frame only for "good cause" shown;

(3) That § 13-5(c) of the Parade Ordinance, to the extent it requires an applicant to "meet with the Police Chief to discuss and attempt to agree on the details on the route and other logistics," violates the First Amendment and is unconstitutional;

(4) That § 13-5(e) of the Parade Ordinance and § 3-120 of the MOGO, to the extent that neither allows for a waiver of fees for indigents, violate the First Amendment and are unconstitutional.   Also, the City's current method of calculating costs of traffic control and clean up to be paid by the applicant violates the First Amendment and is unconstitutional; and,

(5) That § 3-122 of the MOGO, providing an exemption for athletic events "conducted by the Board of Education, Little League or other organizations, provided alcohol is not available" violates the First Amendment and is unconstitutional.

*Id.* at 40-41, 51.

### 3.    The Appeal

---

[4] *Sullivan v. City of Augusta* (*Sullivan II*), 406 F. Supp. 2d 92 (D. Me. 2005).

The City appealed to the Court of Appeals for the First Circuit.  On December 14, 2007, finding that the Plaintiffs did not have standing to challenge the MOGO, the First Circuit vacated all this Court's rulings on that ordinance.  *Sullivan v. City of Augusta* (*Sullivan III*), 511 F.3d 16, 20 (1st Cir. 2007).  The *Sullivan III* Court affirmed the rulings "that the advance notice and in-person meeting requirements of the parade ordinance are constitutionally defective and . . . that the $478.55 overcharge to Sullivan was unconstitutional."  *Id.*  However, the Court reversed the rulings "that the fee provision grants excessive discretion to the police and that the parade permit fee of $100 and associated charges for police traffic control are unconstitutional insofar as indigents must pay them without being given an opportunity to seek and secure a wavier on account of their indigency."  *Id.*

**C.    The Plaintiffs' Request for Attorney Fees:  Prevailing Parties**

Recognizing that the fee-shifting statute entitles only prevailing parties to attorney fees paid by the government, the Plaintiffs stress that they prevailed on "four very important First Amendment claims":  (1) the bond requirement, which was the subject of their motion for temporary restraining order; (2) the thirty-day advance notice requirement; (3) the in-person meeting requirement; and, (4) the permit fee charged to and paid by Sullivan, which included "some profit" for the City.  *Pls.' Mot.* at 2-5.  The Plaintiffs go further and say that the vindication of these rights went beyond the city of Augusta and had the salutary effect of removing restrictions on the exercise of First Amendment rights from the ordinances of other Maine municipalities.  *Id.* at 5-7.  Finally, the Plaintiffs assert that they should be reimbursed for all the time and expenses in this lawsuit, even if spent on the unsuccessful claims, because the successful and unsuccessful claims were intertwined and because in any event, they vindicated important constitutional rights by pressing the claims on which they were successful.  *Id.* at 7-10.

### D.    The City's Opposition

The City first contends that the Plaintiffs are entitled to no fee at all, since they lost on "their central claims."  *City's Opp'n* at 2.  The City observes that the Plaintiffs engaged in a wholesale assault on the constitutionality of significant provisions of the Augusta parade and MOGO ordinances, specifically the absence of an indigency exception to the parade permitting process and the discretion conferred on public officials to determine the amount chargeable for the parade permit.  *Id.*  The City points out that the Plaintiffs did not prevail on either of these groundbreaking theories.  Further, the City argues that the one issue on which the Plaintiffs did prevail "was decided *just four days into the case* and not contested by the City thereafter."  *Id.* (emphasis in original).[5]  Comparing what the Plaintiffs initially sought with what they finally achieved, the City characterizes their victories as being on "three minor points," which had received "at best, passing mention in the Complaint."  *Id.* at 8.

### E.    The Plaintiffs' Request:  $115,751.44[6]

The Plaintiffs have been represented by three different attorneys:  Zachary Heiden, Lynne Williams, and David Webbert.  Mr. Heiden and Ms. Williams initiated the action on March 15, 2004; Mr. Webbert entered his appearance on July 26, 2004.  Mr. Heiden filed a supporting affidavit stating that his regular hourly billing rate was $175 from February 15, 2004 to December 31, 2006 and $200 from January 1, 2007 to date, and itemizing 264.25 hours billed

---

[5] The Court has a stylistic quibble with the City's repetitious use of italics throughout its memorandum to stress what counsel sees as more convincing contentions.  *See Def.'s Opp'n* at 17 (stating that "Plaintiffs for the most part *failed to achieve their desired outcome*, 'prevailing' instead on *different and far less significant claims* that achieved *different and far less significant outcomes* than the claims featured in their Complaint").  The Plaintiffs too lapsed into highlighting in bold within the body of their memorandum.  *Pls.' Mot.* at 18 (stating that "**[i]n the exercise of their billing judgment, however, Plaintiffs' counsel have decided to voluntarily reduce their request for fees even further based on their lack of success on some claims and their recognition of the unusually difficult circumstances now facing local governments in Maine**").  Counsels' memoranda become the legal equivalent of shouting when making meaningful points, reminiscent of the John Irving character Owen Meany, who throughout the novel speaks only in capital letters.  *See* John Irving, *A Prayer For Owen Meany* (1989).  The Court is capable of making its own determinations without counsel making a *didactic emphasis* when they believe they are **making** a SIGNIFICANT POINT.

[6] The Court discusses the additional fee request of $6,000 *infra* Part II.E.5.

6

during the litigation. *Decl. of Zachary L. Heiden, Esquire* (Docket # 85). Mr. Heiden claims unreduced attorney fees of $52,850, calculated at his current rate, and $1,885 in expenses for a total of $54,735. *Id.*; *Pls.' Mot.* at 18-19. Ms. Williams filed a supporting affidavit stating that her regular hourly billing rate is $190, and itemizing 28.15 hours billed during the litigation. *Decl. of Lynne A. Williams, Esq.* ¶¶ 10, 21, Attach. 1 (Docket # 86). Ms. Williams claims unreduced attorney fees of $5,348.50 and $242.44 in expenses for a total of $5,590.94. *Id.* ¶ 21; *Pls.' Mot.* at 18-19. Mr. Webbert also filed a supporting affidavit, resume, retainer agreements, and billing worksheet, itemizing 618.70 hours billed during the litigation by Mr. Webbert and several members of his firm, Johnson & Webbert, L.L.P. (J&W), at various hourly rates. *Decl. of David G. Webbert, Esq.*, Attach. 1, 2, 3 (Docket # 84). Mr. Webbert claims unreduced attorney fees of $159,329, calculated at 2008 rates, and $1,954.46 in expenses for a total of $161,283.46. *Decl. of David G. Webbert, Esq.*, Attach. 1, 2, 3 (Docket # 84) (*Webbert Decl.*); *Pls.' Mot.* at 18-19. The unreduced grand total is $221,609.40.

Due to their lack of success on some claims and for other reasons, however, the Plaintiffs made several voluntary reductions to their overall fee request. They elected not to include fees incurred in their unsuccessful petitions for rehearing by the First Circuit and for a writ of certiorari from the Supreme Court. *Pls.' Mot.* at 11-12. They also elected not to include fees for excess coverage of depositions and decided to calculate Mr. Webbert's fee at his 2007 rate of $300 instead of his 2008 rate of $330. *Id.* at 12, 17. After making these deductions, they further reduced the balance by one-third to account for their lack of success on some claims. *Id.* at 18. The Plaintiffs ultimately reduced Mr. Heiden's fee to $31,167 (a reduction of $21,683), Ms. Williams's to $3,566 (a reduction of $1,783), and J&W's to $77,589 (a reduction of $81,760).

*Id.* at 18.  They also reduced J&W's request for expenses to $1,302 (a reduction of $652).  *Id.* at

19.  The total reduced request for attorney fees and expenses is $115,751.44.  *Id.*

After the City responded, the Plaintiffs challenged defense counsel to reveal what they

charged the city of Augusta for defending the lawsuit.  *Pls.' Reply* at 4-5.  Stephen Langsdorf—

the City's principal lawyer in the case and partner with the law firm Preti, Flaherty, Beliveau &

Pachios, LLP—answered by filing an affidavit that confirmed his law firm originally charged the

City $105,785, which it reduced to $82,476.25 in the exercise of billing judgment.  *Aff. of

Stephen E.F. Langsdorf, Esq. for Att'y's Fees and Expenses* ¶ 5 (Docket # 102).  The bill

attached to the affidavit shows that the attorneys in Mr. Langsdorf's firm charged between $100

and $180 per hour for legal work during the case.  *Id.*, Attach. 1.

### F.     The City's Objections

The City first objects to Attorney Webbert's hourly rate of $330 as excessive and

unreasonable.  *City's Opp'n* at 17.  It points out that another prominent civil rights attorney,

Richard O'Meara of Portland, charges between $225 and $275 per hour, and contends that Mr.

Webbert's reduction of his hourly rate to $300 "acknowledges, but does not cure, the problem."

*Id.*

Next, the City objects to excessive time charges generally, and says that the reimbursable

time and expenses should end on March 19, 2004 when the Court issued the temporary

restraining order.  It says that "[t]o the extent that Plaintiffs are entitled to *any* compensation

from the City for this performance by their counsel, it should be measured by their fees

reasonably incurred up to the point at which the TRO on the Bond/Insurance Requirement was

granted."  *Id.* at 19 (emphasis in original).  The City also contests the devotion of 100 hours of

attorney time to get to the temporary restraining order stage.  *Id.*

Finally, the City does not credit the Plaintiffs' "grand and generous gesture" of voluntarily reducing their attorney fees by one-third. *Id.* at 18.  Instead, it maintains that after so reducing the attorney fees, the Court should "further reduce the resulting number by a factor of at least three." *Id.* at 19.  The City closes by asserting that the entire motion for attorney fees and expenses should be denied, but if granted, the award should equal no more than "5% of the request to account for the minimal success Plaintiffs have achieved in this litigation." *Id.*

## II.   DISCUSSION

### A.   Legal Standards

#### 1.   Prevailing Party

Pursuant to 42 U.S.C. § 1988(b), in a suit brought under 42 U.S.C. § 1983, a court, "in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."[7]  Congress viewed § 1988 fees as "'an integral part of the remedies necessary to obtain'" compliance with § 1983.  *Maine v. Thiboutot*, 448 U.S. 1, 11 (1980) (quoting S. Rep. No. 94-1011, at 5 (1976)).  In *Poy v. Boutselis*, the First Circuit articulated the standard for determining whether a party has prevailed:

> We begin with the threshold principle enunciated by the Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), endorsing our formulation in *Nadeau v. Helgemoe*, 581 F.2d 275, 278-79 (1st Cir. 1978), that "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."

352 F.3d 479, 487 (1st Cir. 2003) (quoting *Nadeau*, 581 F.2d at 278-79); *De Jesus Nazario v. Rodriguez*, 554 F.3d 196, 199 (1st Cir. 2009).  The First Circuit recently reiterated that a plaintiff

---

[7] Section 1988 is but one of several statutory grants of authority to award a reasonable attorney's fee to the prevailing party under federal law; these fee-shifting provisions are to be interpreted consistently.  *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 n.4 (2001); *Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983) (stating that the "legislative history of § 1988 indicates that Congress intended that the standards for awarding fees be generally the same as under the fee provisions of the 1964 Civil Rights Act" (internal quotation omitted)).

is a prevailing party when the "'actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying [the] defendant's behavior.'" *De Jesus Nazario*, 554 F.3d at 199 (quoting *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992)).

Where, as here, a plaintiff obtains declaratory or injunctive relief, or some combination of the two, the prevailing party analysis is somewhat nuanced because "obtaining equitable relief does not automatically confer prevailing party status" under § 1988. *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 293 (1st Cir. 2001) (citing *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989); *Rhodes v. Stewart*, 488 U.S. 1, 3-4 (1988)). To determine whether the beneficiary of declaratory or equitable relief is a prevailing party, the court "always must make a qualitative inquiry into the import of the relief obtained." *Id.* The court should be wary of those successes that fairly can be "characterized as purely technical or *de minimis*," because they do not justify an award of attorney fees under § 1988. *Tex. State Teachers*, 489 U.S. at 792; *Gay Officers*, 247 F.3d at 294. Importantly, the court should not confuse its assessment of the relief, which is relevant to the threshold prevailing party inquiry, and its assessment of the "'degree of the plaintiff's overall success,'" which is relevant to a later determination of the amount of a reasonable fee award. *De Jesus Nazario*, 554 F.3d at 202 (quoting *Farrar*, 506 U.S. at 114); *Hensley*, 461 U.S. at 440.

Once a court determines that a litigant is a prevailing party under § 1988, the court must determine whether there is any reason not to award attorney fees. Despite the "permissive terminology" of the statute, the First Circuit has observed that awards of attorney fees "in favor of prevailing civil rights plaintiffs are virtually obligatory."[8] *Gay Officers*, 247 F.3d at 293; *De Jesus Nazario*, 554 F.3d at 200.

_____

[8] Although there may be "special circumstances" under which a court should deny a prevailing plaintiff an attorney's fee, they are "few and far between." *De Jesus Nazario*, 554 F.3d at 200. The First Circuit has included

## 2.      Calculation of a Reasonable Fee Award

Following a determination that the plaintiff is a prevailing party and that there are no special circumstances warranting a denial of an award, a court must calculate a reasonable fee award.  In *De Jesus Nazario*, the First Circuit outlined the appropriate process.  *Id.* at 207-08. The court should begin with the lodestar analysis, "multiplying the number of hours productively spent by a reasonable hourly rate to calculate a base figure." *Id.* at 207.  The court may "adjust the hours claimed to remove time that was unreasonably, unnecessarily or inefficiently devoted to the case." *Id.*  Further, "subject to principles of interconnectedness, the trial court may disallow time spent litigating failed claims." *Id.*  Finally, the district court has the authority "to adjust the lodestar itself upwards or downwards based on several different factors, including the results obtained, and the time and labor required for the efficacious handling of the matter." *Id.*

## B.      Whether the Plaintiffs Prevailed

## 1.      Whether the Plaintiffs Prevailed At All

The City's overarching position that the Plaintiffs did not prevail at all in this case is simply untenable.  *See City's Opp'n* at 11 (stating that the "Plaintiffs' accomplishments in this case are so meager that they should not be deemed the prevailing party *at all* for fee-shifting purposes") (emphasis in original).  The original Complaint asserted in part that "Ordinance § 13-5 is constitutionally flawed in at least three ways":  (1) the absence of an indigency exception to the fee provision conditions free expression and association on one's ability to pay; (2) the requirement of a surety bond or proof of insurance is insufficiently tailored; and, (3) the requirement of a surety bond or proof of insurance is unconstitutionally vague and overbroad

---

among these special circumstances "outrageous" or "inexcusable" conduct on the part of the plaintiff or his counsel; "bad faith or obdurate conduct"; and, "unjust hardship that a grant or denial of fee shifting might impose." *Id.* (internal quotations omitted).  Portions of the City's memorandum could be read as implying outrageous, inexcusable, bad faith or obdurate conduct, but to the extent such an allegation is being made, the Court rejects it.

because it vests too much discretion in the Police Chief.  *Compl.* ¶ 25.  In its Order on the motion for temporary restraining order, the Court concluded that subsection (f) of § 13-5 was unconstitutional because it required the Police Chief to assess the content of the proposed event and it failed to articulate standards by which the Chief could make the bonding or insurance determination.  *Sullivan I*, 310 F. Supp. 2d at 355-56.  In their motion for attorney fees, the Plaintiffs assert that after the Court's Order in *Sullivan I*, the City amended both its parade ordinance and its MOGO to delete the bond provision.  *Pls.' Mot.* at 3.  The City concedes in its opposition that the Plaintiffs' success on that issue was "not contested by the City thereafter." *City's Opp'n* at 2.

The Court agrees with the Plaintiffs that the elimination of the bonding and insurance requirement was a significant victory for the exercise of First Amendment rights in Maine's capitol city.  The Plaintiffs correctly capture the importance of this ruling:  "Because of this lawsuit, this onerous financial obstacle no longer burdens the free speech rights of any person who wants to march or parade in Augusta."  *Pls.' Mot.* at 3.  In view of this result, it is beyond question that the Plaintiffs "succeed[ed] on [a] significant issue in litigation which achieve[d] some benefit the parties sought in bringing suit."  *Poy*, 352 F.3d at 487.  The City has assumed an unreasonably aggressive and unsupportable stance in contending that the Plaintiffs did not prevail at all and are entitled to no attorney fees.  The Court concludes that the Plaintiffs prevailed within the meaning of 42 U.S.C. § 1988(b) by obtaining a temporary injunction against the City's enforcement of the bonding and insurance requirement of its parade ordinance, and that they are entitled to reasonable attorney fees under the statute.

**2.      Other Issues on which the Plaintiffs Prevailed**

In the litigation that followed the temporary restraining order, the Plaintiffs did not prevail on all the remaining issues; they prevailed on some. The City claims that the issues on which the Plaintiffs prevailed were so inconsequential that the Plaintiffs cannot be said to have prevailed in the lawsuit within the meaning of § 1988(b). Thus, the City argues, even if the Plaintiffs are entitled to attorney fees through the temporary restraining order phase, they are entitled to no other fees. Again, the Court disagrees with the City. When the dust settled in this case, the Plaintiffs emerged victorious on a number of significant issues.

### a.   Standing and Ripeness on Constitutional Challenges to the Parade Ordinance

In its opposition, the City makes much of the Plaintiffs' failure to establish requisite standing on their challenge to the MOGO.[9] However, even though they lost on MOGO standing, the Plaintiffs won on the question of whether they had standing to challenge the thirty-day advance notice requirement in the parade ordinance. *Sullivan III*, 511 F.3d at 30-32. The City— having lost in this Court on the question—contended on appeal that the Plaintiffs lacked standing because they "never demonstrated any intent or need to apply for their parade permits fewer than thirty days before the marches for which the permits were being sought." *Id.* at 31. The *Sullivan III* Court rejected the City's standing argument, observing that "a late application is not necessary if injury can otherwise be surmised." *Id.* Further, the *Sullivan III* Court went on to cite Mr. Sullivan's deposition testimony that he was at another time deterred from applying for a

---

[9] The City says the following about the First Circuit's standing ruling on the Plaintiffs' challenge to the MOGO: "In other words, the challenge to the [MOGO] was found to be a manufactured controversy invented by Plaintiffs and their counsel, not a tangible grievance warranting judicial intervention." *City's Opp'n* at 7. This is a rather extraordinary statement. Whether the Plaintiffs had standing to make a First Amendment challenge to the MOGO was not an easy call. This Court struggled with the issue and consumed five full pages narrowly resolving it in favor of the Plaintiffs. *Sullivan II*, 406 F. Supp. 2d at 99-104. The First Circuit disagreed. But, it did not do so summarily. The *Sullivan III* Court extensively analyzed the "injury-in-fact" requirement for standing under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and *Osediacz v. City of Cranston*, 414 F.3d 136, 143 (1st Cir. 2005), and ultimately credited as authoritative the City's view that MOGO was not meant to apply to Plaintiffs' conduct. *Sullivan III*, 511 F.3d at 25-31. Even discounting advocacy, the City's dismissive and accusatory language is unsettling and, worse yet for the City, unconvincing.

parade permit because of the thirty-day requirement. *Id.* This portion of *Sullivan III* can be viewed as articulating an important roadmap for those desiring to wage a constitutional challenge to an advance notice requirement.

### b.    Constitutionally Excessive Fee

Although the *Sullivan III* Court overruled this Court's conclusion that the parade ordinance fee provisions lacked sufficiently precise and definite standards to guide the police, the appellate Court agreed that the police had overcharged Mr. Sullivan in the amount of $478.55 and that the overcharge amounted to a violation of his constitutional rights. *Id.* at 34-38. *Sullivan III* reinforced the principle that "a government cannot profit from imposing licensing or permit fees on the exercise of a First Amendment right" and emphasized that municipal officials should be especially careful in calculating licensing fees when the exercise of First Amendment rights is implicated.[10] *Id.* at 37-38.

The City makes the following point about the overcharge:

Measured against the relief Plaintiffs had sought—a declaration that *no fee* could be required of indigent applicants—their entitlement to a $478.55 refund out of a total fee approaching $2,000 is a triumph of modest proportions indeed, a correction of a miscalculation, not the righting of a constitutional wrong.

*City's Opp'n* at 8-9 (emphasis in original). Here, the City is plainly wrong. The First Circuit addressed and firmly rejected the City's "triumph of modest proportions" argument, writing that "[a] mistaken calculation of nearly $500 cannot in this context be considered de minimis." *Sullivan III*, 511 F.3d at 37. But, more significantly, although the City characterizes the appellate ruling as not being "the righting of a constitutional wrong," the First Circuit expressly concluded that the overcharge was of constitutional dimension: "It is a violation of the First

---

[10] The First Circuit did more. In a helpful footnote, the First Circuit suggested that "[o]ne way to guard against, or at least correct, a future overcharge of this sort would be to include in the parade ordinance a provision permitting some type of readily available administrative review process." *Sullivan III*, 511 F.3d at 37 n.12.

Amendment to have charged Sullivan more than the actual administrative expenses of the license, as set forth in the ordinance." *Id.* at 38.

c.       <strong>Thirty-Day Notice Requirement</strong>

In *Sullivan III*, the First Circuit struck down as unconstitutional the City's thirty-day advance notice requirement for a parade permit, and it did so even though the ordinance had a "good cause" exception to the advance notice requirement. *Id.* at 38-40. The City argues that this result is "no great accomplishment, for three reasons": first, the thirty-day requirement was not central to the Plaintiffs' Complaint; second, the "30 Day Requirement *never adversely affected either Plaintiff*, and Plaintiffs therefore derived no benefit from the Court's ruling on this issue"; and, third, the Plaintiffs never invoked the "good cause" exception to the thirty-day notice requirement. *City's Opp'n* at 9-10.

The Court elsewhere addresses the City's contention that the Plaintiffs' victories were not central to their claim and, therefore, under *Farrar* should not entitle them to attorney fees. The City's second argument, however, misreads the First Circuit opinion. The *Sullivan III* Court concluded that the Plaintiffs had standing to challenge the thirty-day requirement. For the City now to argue that the Plaintiffs were so unaffected that they are not entitled to a § 1988(b) fee is to make an argument to the district court that the City lost at the appellate court. *Sullivan III*, 511 F.3d at 30-32. Moreover, even though the Supreme Court requires that a movant for attorney fees under § 1988(b) demonstrate a "judicially sanctioned change in the legal relationship of the parties," *Buckhannon*, 532 U.S. at 605, it is also true that the causes of action for which § 1988(b) fees may be available are not matters solely of private concern. *See Gay Officers*, 247 F.3d at 295 (stating that § 1988 "was intended to encourage citizens to vindicate rights that concern the public as a whole").

15

The City's third argument is a non-sequitur.  Notwithstanding the good cause exception, the First Circuit ruled that the thirty-day advance notice period in the parade ordinance was "unconstitutional."[11]  *Sullivan III*, 511 F.3d at 40.  The First Circuit's passing observation that "[i]f the 'good cause' exception were attached to a reasonably short application period, we might rule otherwise," *id.*, may assist the City in enacting an ordinance that passes constitutional muster, but does not diminish the Plaintiffs' success in obtaining a First Circuit ruling that its existing ordinance failed to do so.

The City's arguments aside, the *Sullivan III* Court's conclusion—that the City cannot constitutionally impose a thirty-day advance notice requirement for a parade permit—remains, in the Court's view, an important decisional marker.  *Sullivan III* recognized that "[p]eople may, in some cases, wish to engage in street marches in quick response to topical events" and that any required period of advance notice "can be no longer than necessary to meet the City's urgent and essential [traffic and public safety] needs."  *Id.* at 38.

### d.        The Meet and Attempt to Agree Provision

The *Sullivan III* Court also struck down as unconstitutional the provision of the City's parade ordinance that required an applicant for a parade permit to meet with the Police Chief to attempt to agree on the details of the route and other logistics.  *Id.* at 40-41.  The appellate Court held that "requiring, inflexibly, meeting with the Chief in person within the specified ten-day period as a mandatory condition of issuance of the permit burdens substantially more speech than is necessary."  *Id.* at 41.  The City's primary objection to the award of a § 1988(b) fee for the Plaintiffs' success on this point is that the Complaint did not reference the meet and confer

---

[11] As the First Circuit reached the merits, that neither Plaintiff invoked the exception is immaterial.  The City's "good cause" exception argument reprises the City's second argument and founders for the same reasons.

requirement and "the removal of this requirement was not among the principal objectives of this litigation." *City's Opp'n* at 10. Again, the Court addresses this contention later.

### 3.     Conclusion—Plaintiffs Prevailed

The Court readily concludes that the Plaintiffs prevailed within the meaning of § 1988(b) on five matters of constitutional significance:  (1) the bonding and insurance requirement; (2) standing to challenge the thirty-day advance notice requirement; (3) the proper calculation of the administrative fee; (4) the thirty-day notice requirement; and, (5) the meet and attempt to agree provision.

### C.     Prevailing Parties and the Right to a Statutory Fee Under *Farrar*

The City relies heavily on *Farrar v. Hobby*, a 1992 Supreme Court case, where the Court concluded that even though the plaintiffs in a civil rights action had prevailed under § 1988(b), they were not entitled to a statutory fee, because they were awarded only nominal damages. *Farrar*, 506 U.S. at 105.  Quoting from the Fifth Circuit majority opinion, the Supreme Court compared what plaintiffs sought with what they achieved:

> "The Farrars sued for $17 million in money damages; the jury gave them nothing. No money damages.  No declaratory relief.  No injunctive relief.  Nothing. . . . The Farrars did succeed in securing a jury-finding that Hobby violated their civil rights and a nominal award of one dollar.  However, this finding did not in any meaningful sense 'change the legal relationship' between the Farrars and Hobby. Nor was the result a success for the Farrars on a 'significant issue that achieved some of the benefit the [Farrars] sought in bringing suit.'  When the sole relief sought is money damages, we fail to see how a party 'prevails' by winning one dollar out of the $17 million requested."

*Id.* at 107-08 (alterations in original) (quoting *Estate of Farrar v. Cain*, 941 F.2d 1311, 1315 (5th Cir. 1991)).  Although the *Farrar* Court disagreed with the Fifth Circuit and found that the Farrars had prevailed, the Court nonetheless concluded that "[i]n some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fees at all."  *Id.* at

115.  According to *Farrar*, this is appropriate where a § 1983 plaintiff seeks money damages but fails to prove compensable injury—an essential element of his claim—and recovers only nominal damages as a result.  The plaintiff is a prevailing party because he has technically vindicated his constitutional rights and holds a judgment enforceable against the defendant.  But, for § 1988 purposes, "the only reasonable fee [in such a case] is . . . no fee at all" because the degree of the plaintiff's success is slight.  *Id.*  *Farrar* illustrates the principle that once the parties' legal relationship has been altered and the plaintiff is a prevailing party, "'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'"  *Id.* at 114 (quoting *Hensley*, 461 U.S. at 436).

To convince the Court that Plaintiffs here have not prevailed, the City seizes on dicta in *Farrar* requiring, for prevailing party status, that the relief "the plaintiff secures must directly benefit him at the time of the judgment or settlement."  *Farrar*, 506 U.S. at 111 (citing *Hewitt v. Helms*, 482 U.S. 755, 764 (1987)).  The City contends that the Plaintiffs "derived no 'direct benefit' from *any* of the claims on which the Court ruled against the City," and based on *Farrar*, the City says the request for fees should be denied.  *City's Opp'n* at 11 (emphasis in original).

A case like *Farrar*, in which the plaintiff seeks a large monetary award and receives only a nominal verdict because he fails to prove compensable injury, is a far cry from this case, in which several provisions of a municipal ordinance regulating public speech were held to violate the First Amendment.  Here, in addition to attorney fees, the Plaintiffs sought the following relief:  (1) a declaration that city of Augusta ordinance § 13-5 is unconstitutional facially and as applied; (2) a declaration that §§ 3-119 and 3-120 are facially unconstitutional; and, (3) a permanent injunction against the City's enforcement of those ordinances.  *Compl.* at 11.  The *Sullivan III* Court held that the thirty-day notice provision, the meet and attempt to agree

provision, and the permit fee charged to and paid by Mr. Sullivan were all unconstitutional. *Sullivan III*, 511 F.3d at 45.  Even though the Plaintiffs sought more relief than they finally achieved, the Court concludes that they succeeded on a number of important issues (including two facial constitutional challenges), gained some of the remedies they had originally sought, and materially modified the City's behavior in a fashion that benefitted them.[12]

Finally, the First Circuit has affirmed that so long as the Plaintiffs achieve a necessary degree of success of some claims, the denial of the full range of originally requested relief is not a basis for denying a fee award under § 1988(b).  *Gay Officers*, 247 F.3d at 293-94.  Comparing what was originally sought with what was finally achieved may, however, affect the amount of the award.  *Tex. State Teachers*, 489 U.S. at 790 (stating that "the degree of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not to eligibility for a fee award at all" (emphasis omitted)).

### D.    The Severability of the Award

The City's final substantive point is that because the Plaintiffs did not prevail on a number of their original goals, the Court should separate out attorney fees relating to the successful aspects of the lawsuit and reward only success, not failure.  *City's Resp.* at 14-17.  In *Culebras Enterprises Corp. v. Rivera-Rios*, the First Circuit observed that the "Supreme Court has clearly stated that in assessing a claim for attorneys' fees under section 1988 the district court must exclude from the fees application all hours expended on unsuccessful claims that are distinct from successful claims."  846 F.2d 94, 102 (1st Cir. 1988).  The *Culebras* Court echoes the earlier statement from the Supreme Court that "[t]he congressional intent to limit awards to

---

[12] A successful challenge to the facial constitutionality of a law invalidates the law itself.  *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982) ("A 'facial' challenge . . . means a claim that the law is 'invalid *in toto*—and therefore incapable of any valid application.'" (quoting *Steffel v. Thompson*, 415 U.S. 452, 474 (1974))).

prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." *Hensley*, 461 U.S. at 435.

On the other hand, the First Circuit has adopted the "doctrine of interrelatedness." *Lipsett v. Blanco*, 975 F.2d 934, 940 (1st Cir. 1992). According to this doctrine, "attempts to allocate hours between claims may be unwarranted where an action involves related legal theories applied to a common core of facts." *Phetosomphone v. Allison Reed Group, Inc.*, 984 F.2d 4, 7 (1st Cir. 1993). Also, the Court "should not attempt to parse out work on unsuccessful claims hour-by-hour 'where it would be an exercise in futility.'" *Alfonso v. Aufiero*, 66 F. Supp. 2d 183, 194 (D. Mass. 1999) (quoting *Lipsett*, 975 F.2d at 940-41). Instead, the court may consider "less-than-complete success as a factor in adjusting the lodestar," mindful that subtracting hours devoted to unsuccessful claims and reducing the lodestar would "run the risk of doubly reducing the award." *Id.*

Here, the constitutional claims, both successful and unsuccessful, easily fit within the interrelatedness doctrine, since they involved related legal theories and a common set of facts, and attempts to carve out time devoted to them would be fruitless. Further, other than generally complaining about the overall amount of time and the size of the fee, the City has not suggested how the Court can reasonably differentiate between time spent on the successful and the failed claims, and reviewing the submissions, at least until the issuance of the First Circuit decision, the Court cannot make a differentiation on any rational basis. For the time up to and including December 15, 2007, the Court will, therefore, apply the "less-than-complete success" factor in adjusting the lodestar. *Hensley*, 461 U.S. at 436 (stating that "[i]f . . . a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a

20

whole times a reasonable hourly rate may be an excessive amount"); *Coutin v. Young & Rubicam P.R., Inc.*, 124 F.3d 331, 339 (1st Cir. 1997); *Alfonso*, 66 F. Supp. 2d at 194.

After the First Circuit issued its decision on December 14, 2007, the Plaintiffs moved for rehearing en banc and petitioned for a writ of certiorari.   Neither was successful and the Plaintiffs did not "prevail" on legal work relating to these post-appellate decision activities.   The Court has therefore reviewed the attorneys' bills for work after December 15, 2007, and has excluded fees and expenses attributable solely to legal arguments on which the Plaintiffs did not prevail.[13]  Mr. Heiden's fee during this period equals $4,000, or a total of twenty hours at $200 per hour; he did not incur any expenses.  For the same period, Mr. Webbert's fee equals $29,469, or 89.3 hours at $330 per hour; Elly Burnett's equals $1,137.50, or 9.1 hours at $125 per hour; and Max Katler's equals $1,965, or 26.2 hours at $75 per hour; plus $315.09 in expenses for a total of $32,886.59 for J&W.   In the aggregate, the Plaintiffs' attorneys billed $36,886.59 ($32,886.59 + $4,000) for their pursuit of unsuccessful claims.   The starting point must be the total unreduced request of $221,609.40 minus $36,886.59, or a lodestar amount of $184,722.81 net of time and expenses devoted to the petitions for rehearing and certiorari.

### E.    Calculation of the Fee

#### 1.    Specific City Objections

##### a.    Mr. Webbert's Hourly Rate

---

[13] The Plaintiffs point out that their own reduced fee request excludes time devoted to the petitions for rehearing and certiorari. *Pls.' Mot.* at 11.  The Court agrees that this time should not be compensated but, instead of accepting Plaintiffs' round figures, the Court excluded all time devoted to the litigation after December 15, 2007, with the exception of time specifically devoted to preparing the fee petition. *See Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331, 340 (1st Cir. 2008) ("A prevailing party in a civil rights action normally is entitled to attorneys' fees incurred in the pursuit of fees under section 1988.").

    The Court reviewed descriptions of all legal services provided after December 15, 2007 for which the Plaintiffs' attorneys sought compensation in the original motion, and found that only Ms. Williams itemized time she devoted to obtaining statutory fees.  These 1.2 hours are compensable, are not included in the $6,000 additional fee request, and the Court has not excluded them.  Mr. Webbert's bill contains an entry on October 6, 2008, which seems to include within a charge of .7 hours some undefined amount of time devoted to the fee application.  The Court has not included any of this time in this Order.

The City objects to Mr. Webbert's hourly rate, which escalated from $240 in 2004 to $330 in 2008.  *City's Opp'n* at 17; *Webbert Decl.* ¶ 7.  It compares his hourly rate to the rates charged by a prominent civil rights attorney Richard O'Meara, who practices in Portland and charges between $225 and $275 per hour.  *Id.*  The City says Mr. Webbert has "no business" charging such a high rate.  *Id.*  Defending his hourly rate, Mr. Webbert points to a decision in 2005 in which he says Judge Hornby referred approvingly to his 2005 hourly rate of $260.  *Webbert Decl.* ¶ 8 (citing *Nilsen v. York County*, 400 F. Supp. 2d 266, 285 (D. Me. 2005)).[14]  He also draws support from affidavits of other Maine attorneys who say their hourly rates are similar to Mr. Webbert's.  *Pls.' Mot.* at 13-14; *Pls.' Reply* at 5; *see Decl. of Bernard J. Kubetz, Esq.* ¶ 5 (Docket # 87) (stating that Mr. Webbert's rates "are very comparable to the rates I charged for similar work over the same time periods"); *Decl. of Arthur J. Greif, Esq.* ¶¶ 3-4 (stating that his current hourly rates range from $275 to $290 for civil rights litigation and that Mr. Webbert's rates are "within the prevailing market rate for legal work of comparable attorneys in complex litigation in the Bangor federal court, especially in the specialized area of civil rights law"); *Decl. of James E. Mitchell, Esq.* ¶¶ 6-7 (stating that when he engaged one of Mr. Webbert's partners as an expert witness, he paid rates similar to those charged by Mr. Webbert and that Mr. Webbert's hourly rates are within the prevailing market rate).

In *Grendel's Den, Inc. v. Larkin*, the First Circuit discussed the standard by which an attorney's hourly rate is to be judged.  "'Reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community, that is those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  749 F.2d 945, 955-56 (1st Cir. 1984) (internal quotation omitted); *Mason v. Me.*

---

[14]  The Court carefully reviewed *Nilsen*, including the pinpoint citation, and if Judge Hornby approved Mr. Webbert's $260 hourly rate, he did so most obliquely.

*Dep't of Corr.*, 387 F. Supp. 2d 57 (D. Me. 2005) (approving hourly rate of $185 in 2005 for a lawyer involved in disability rights advocacy); *Okot v. Conicelli*, 180 F. Supp. 2d 238, 246 (D. Me. 2002).

Based on the evidence, the Court approves Mr. Webbert's hourly rates, ranging from $240 to $300.   The Court considers Mr. Webbert to be a highly professional advocate who approaches difficult cases with an admirable blend of diligence, intelligence, and practicality. The Court has taken into account the complexity of the field of First Amendment law, the sophistication required to successfully maintain the claims pressed in this case from federal trial court and through appeal, and the affidavits of experienced counsel who confirmed under oath that they charge similar hourly rates for substantially similar litigation.   The City advanced no argument that Mr. Heiden's hourly rates of $175 and $200 and Ms. Williams's hourly rate of $190 are unreasonable.   The Court agrees and approves Mr. Heiden's and Ms. Williams's hourly rates.

This leads to the question of retroactive application of the highest billing rate to legal work performed before the higher rate became effective.   Mr. Heiden's billing rate changed on January 1, 2007 from $175 per hour to $200 per hour, but his bill multiplies all his time by $200. Similarly, despite the annual escalation of his hourly rate from 2004 to 2008, Mr. Webbert bills all his time from 2004 onward at the highest rate of $330.   Citing *Missouri v. Jenkins*, 491 U.S. 274, 283 (1989), the attorneys justify this retroactive application of the highest hourly rate by observing that the final rate makes up for the delay in payment from complex and lengthy civil rights litigation.   *Pls.' Mot.* at 14.   Under *Missouri* and its progeny, the Court has the discretion to apply the current hourly rate to past legal services.   *Dixon v. Int'l Bhd. of Police Officers*, 434

F. Supp. 2d 73, 85 (D. Mass. 2006); *Kazanjian v. MSM Enters., Inc.*, No. 93-227-P-C, 1995 U.S. Dist. LEXIS 4482, at *7 (D. Me. Mar. 15, 1995).

However, in this case, the Court declines to award retroactive rates.[15]  Mr. Webbert's hourly rates have dramatically escalated during the pendency of this action:  $240 in 2004, $260 in 2005, $280 in 2006, $300 in 2007, and $330 in 2008.  *Webbert Decl.* ¶ 7.  Although the Court approved Mr. Webbert's $300 rate, based on his high degree of professional competence, these increasing rates skirt the very maximum reasonable hourly rates for comparably proficient attorneys in Maine.  The consistent increases in these rates from the beginning of his involvement, far in excess of the rate of inflation, more than adequately compensate Mr. Webbert for the delay in payment.  A less compelling, but similar rule applies to Mr. Heiden's increase.  Applying the lesser hourly rates to Mr. Webbert's work as it was done results in a reduction of $23,486.[16]  Applying the lesser hourly rate to Mr. Heiden's work as it was done results in a reduction of $6,056.25.[17]  Finally, Mr. Webbert bills the 2005 summer associate work of Elly Burnett, who in September 2007 joined the firm as an associate attorney, at her attorney rate.  Instead of applying the $125 associate attorney rate to her work when she was a law student, the Court has used the $95 per hour rate that Mr. Webbert charged in 2006 for another

---

[15] Had they failed to apply 2008 hourly rates to all legal services, Mr. Webbert and Mr. Heiden would have signaled a lack of confidence in their position that the highest rate should apply retroactively.  But, by applying the 2008 rates and not breaking down their bills by year, Mr. Webbert and Mr. Heiden ran the risk that the Court would reject retroactive application and would have to completely recalculate their bills without their assistance.  For Mr. Heiden, the calculation was easy, because he only charged 22 hours of billable time after January 1, 2007 when his rate changed.  In Mr. Webbert's case, however, the Court had to add up the total number of hours for each year to which lower rates applied, calculate the allowed amount under the approved rates, and subtract out the difference to arrive at a new allowable fee—a substantial amount of extra work.  Maybe this is precisely what was intended.

[16] This total is calculated by adding the following:  (1) 2004:  85.7 x $90 = $7,713; (2) 2005:  135.1 x $70 = $9,457; (3) 2006:  123.3 x $50 = $6,165; (4) 2007: 3.2 x $30 = $96.  In addition, Mr. Webbert's partner, Phillip Johnson, charged .5 hours in 2004 and .2 hours in 2006, which the Court also reduced to the then existing rates for an additional reduction of $55 [(.5 x $90) + (.2 x $50)].

[17] The Court subtracted the number of hours after January 1, 2007 from the total number of hours in the bill.  Mr. Heiden spent a total of 264.25 hours of which 22 were spent after January 1, 2007.  He therefore billed 242.25 hours at the retroactive rate of $200.  Multiplying 242.25 by $25 (the difference between the $200 and the $175 hourly rate) results in a total of $6,056.25.

summer associate.  The total amount of time Ms. Burnett spent in 2005 was 21.7 hours, which multiplied by the $30 difference between associate attorney and summer law clerk rates equals $651.  The total reduction equals $30,193.25.

Having determined that all Plaintiffs' attorneys' hourly rates were reasonable for the work as it was done, the Court uses the lodestar amount of $154,529.56, net of time and expenses devoted to the petitions for rehearing and certiorari and calculated based on the hourly rates that existed when the work was performed.[18]

### b.    Time Charged

The City made one specific complaint about the time charged by Plaintiffs' counsel.  It challenges the one hundred hours charged "to get to the TRO stage in this case," and claims to be "at a loss to understand how so much time could have been required to prepare these preliminary papers and attend a hearing."  *City's Opp'n* at 19.  Given the complexity of the case and the need to do due diligence before filing an application for a temporary restraining order, the Court rejects the City's complaint.

### 2.    Other Concerns

In reviewing the Plaintiffs' bills, the Court addresses two other concerns, one raised by the parties, one not.  First, it is curious that the Plaintiffs required the representation of multiple law firms.  Each of the Plaintiffs' counsel touts his or her expertise in First Amendment litigation, but by the same token, it might be expected that one attorney or one law firm would be

---

[18] Mr. Webbert's bill contains a substantial amount of non-attorney time.  The City did not object either to the amount of time or to the hourly rates.  The paralegals are billed at between $60 and $75 per hour.  As noted earlier, the 2006 summer associate, a second year law student, was billed at $95 per hour.  The Court applied this $95 hourly rate to Mr. Webbert's summer associates for the years 2005 and 2006.

The Court notes in passing that the rates Mr. Webbert charged for second year law students exceeded the hourly rates of $90 in 2005 and $92 in 2006 then allowable to panel counsel, who defend federal criminal defendants in non-capital cases.  Like Mr. Webbert, these criminal defense attorneys occasionally marshal significant constitutional arguments in favor of their clients, call upon a broad range of trial skills, perform a vital public service, and submit their bills for payment from the public fisc.

able to adequately address the issues without the additional expense of consulting each other. This is especially true once Mr. Webbert entered his appearance on July 26, 2004. *Notice of Appearance of David G. Webbert, Esq.* (Docket # 21). For example, both Mr. Webbert and Mr. Heiden billed separately for preparation for and attendance at oral argument before the First Circuit in Boston.

The City has not raised this objection.[19]  In view of the significance of the legal issues and the fact that neither Ms. Williams nor Mr. Heiden works in a law firm, the Court is satisfied that the joining of independent practices for purposes of representation in this case does not represent double billing, and once Mr. Webbert entered his appearance, Ms. Williams stopped billing the case. In fashioning the fee award, the Court has taken into account, however, Mr. Webbert's late appearance in the case, his need to review work previously performed by other counsel, and the extent to which he duplicated work for which other counsel separately billed.

The City questioned the amount of time Plaintiffs' counsel spent prosecuting the case when compared to the amount of time the City attorneys spent defending it. This is a fair question. The City says that the "total time recorded by Plaintiffs' attorneys ($217,528) is *more than twice* the total time recorded by the City's 'high-powered defense team' ($105,785)." *City's Sur-Reply* at 2 (emphasis in original). The City takes its figures, however, from the gross billing amounts, and these figures do not take into account substantial differences in hourly

---

[19] The Preti Flaherty bill reveals that eleven different attorneys were involved to some degree in the defense of the lawsuit, including the presence of two attorneys at the First Circuit argument. *Aff. of Stephen E.F. Langsdorf, Esq. for Att'y's Fees and Expenses*, Attach. 1 at 20 (Docket # 102-2).

rates.[20]  Comparing the gross number of attorney hours for the Plaintiffs and the City:  Preti Flaherty expended 638.25 hours; the Plaintiffs' lawyers together expended 827.60.[21]

It is not surprising that the attorneys for a moving party, particularly a plaintiff in a sophisticated civil action, would have to spend more time creating and prosecuting a case than a respondent would have to spend defending it.  This is especially true in a case, like this one, where before bringing suit the Plaintiffs' lawyer is obligated to sift through a wide range of potential legal theories, discard the less applicable, and focus on the more sustainable.  By contrast, defense counsel must deflect a set of pre-packaged legal theories.  The difference is, in short, between building a brick wall and knocking the bricks out.  Here, the Court is not impressed that an extra 189.35 hours on the part of Plaintiffs' counsel suggests overbilling.  In fact, the Plaintiffs expended over fifty hours on the case before defense counsel even became involved.  *See Decl. of Zachary L. Heiden, Esquire* at 6; *Decl. of Lynne A. Williams, Esq.*, Attach. 1 at 1.

### 3.    The "Less Than Complete Success" Factor

The City's most salient point is that under *Hensley* the attorney fees should be reduced to reflect the Plaintiffs' lack of success on some of the main objectives of the lawsuit.  The original Complaint alleged that the Augusta parade and MOGO ordinances were constitutionally flawed due to:  (1) the failure to provide an indigency exception to administrative fees; (2) the requirement of the surety bond or proof of insurance; (3) the thirty-day advance notice requirement; (4) the absence of standards for the good faith exception to the thirty-day notice requirement; (5) the absence of a mandatory reply period; and, (6) the imposition of fees for

---

[20] The City conflates the total amount of the bills with total time.  The respective bills reveal that the top billing rate for city of Augusta work at Preti Flaherty is $180; Mr. Webbert's 2008 billing rate was $330.  The Court compared hours to hours in each bill to arrive at an "apples to apples" comparison.

[21] To avoid further complicating the comparison, the Court has not included in this calculation charges for paralegal work or charges associated with the City's defense of the Plaintiffs' request for fees.

police services.  *Compl.* ¶¶ 25-27.  The Plaintiffs' Amended Complaint added a more specific allegation that the ordinance was unconstitutionally vague and overbroad because it invested in the Police Chief complete discretion in determining the amount and duration of staffing by the police.  *Am. Compl.* ¶ 25A.  It also added a more specific allegation against the MOGO, asserting that it promoted content and viewpoint discrimination by exempting certain organizations.  *Id.* ¶ 26A.  Finally, by the time they filed their dispositive motion, the Plaintiffs had also attacked the meet and attempt to agree provision of the ordinance.

Comparing what was sought with what was achieved, early on, the Plaintiffs achieved total victory on the insurance/bond requirement.  The Court issued a temporary restraining order against enforcement of the insurance/bond requirement, concluding that subsection (f) of § 13-5 of the ordinance violated the United States Constitution.  *Sullivan I*, 310 F. Supp. 2d at 356.  The City capitulated, amended both the parade and MOGO ordinances to eliminate the insurance/bond requirements, and did not further contest the issue.  *Pls.' Mot.* at 3; *City's Opp'n* at 2.

The Plaintiffs also achieved clear victories on the thirty-day notice requirement and the meet and attempt to agree provision, and partial victories on the good cause exception and the Police Department's method of calculating the administrative fees.  Further, at the trial and appellate court levels, the City defended the lawsuit in part on the Plaintiffs' alleged lack of standing to challenge the thirty-day provision, and the Plaintiffs prevailed on that issue as well.  *Def.'s Resp. to Mot. for J. on Liability, and Cross-Mot. for J. on Liability* at 15-16 (Docket # 48); *Sullivan III*, 511 F.3d at 30-32.

At the same time, the Plaintiffs lost on a number of significant issues.  First and most importantly, they ultimately failed on two of their most groundbreaking, and interrelated claims:

28

(1) that the Constitution requires an indigency exception to the City's administrative fee structure; and, (2) that the Constitution recognizes a distinction between marching down a street and marching down a sidewalk.  The City defended the lawsuit in part by pointing out that the Plaintiffs could use the city sidewalks to march without paying any fees and that there were ample alternatives to a street march.  Although the Plaintiffs prevailed on this issue before the trial court and convinced one circuit judge, they did not end up victorious.  This question—the indigency fee waiver issue—was a prime mover behind the filing and prosecution of the lawsuit. It caused the Plaintiffs to hire an expert on whether the alternatives to a street march were constitutionally adequate and, as a matter of first impression within the circuit, consumed considerable time for research, analysis, and discourse.

The Plaintiffs also lost their constitutional challenge to the MOGO.  Whether the Plaintiffs were wise to expend their energies extending their arguments to the MOGO is an open question.  Except for the thirty-day requirement, their standing to challenge the parade ordinance was not in dispute, but their standing to challenge the MOGO was highly contested and murky. Further, the provisions of the MOGO, though analogous to the parade ordinance, required a separate and complicated analysis and argument.  Because the Plaintiffs made the strategic decision to include the sister provisions in the MOGO, they expended much time and effort to what ultimately was a losing cause.

### 4.    Reasonable Attorney Fees

Evaluating the likely amount of time the Plaintiffs spent on the successful versus the unsuccessful issues, the Court has concluded that it is roughly equal.  Accordingly, under *Hensley*, the Court finds that the Plaintiffs' attorneys prevailed on fifty percent of their case, and are entitled to fifty percent of their otherwise reimbursable charges.  Adjusting the lodestar

amount of $154,529.56—net of time devoted to the petitions for rehearing and certiorari and expenses incurred in connection with such efforts and calculated at the hourly rates that existed when the work was done—downward by fifty percent yields reasonable attorney fees under § 1988(b) of $77,264.78.  It is this amount the Court orders.

### 5.       Fees Incurred Litigating the Fee Request

In their motion for fees, the Plaintiffs promised they would include in their reply a request for attorney fees attributable to the fee litigation itself.  *Pls.' Mot.* at 11 n.2.  They kept their word.  *Pls.' Reply* at 6.  Mr. Webbert supported the additional request with a supplemental declaration and billing statement itemizing 40.3 hours that he and Max Katler devoted solely to litigation of the fee request.  *Supplement Decl. of David G. Webbert, Esq.*, Attach. 1 (Docket # 99-2).  Of these 40.3 hours, Mr. Webbert billed 32.6 hours at $330 per hour and Mr. Katler billed 7.7 hours at $75 per hour, yielding an unreduced additional fee request of $11,335.50.  *Id.* Plaintiffs reduced this amount to $6,000 in the exercise of billing judgment.  *Pls.' Reply* at 6.  In its motion for leave to file a sur-reply, the City specifically cited Plaintiffs' additional fee request as a new argument that warranted an exemption from the ordinary prohibition on sur-replies.  *Def's Mot. for Leave to File Surreply*  (Docket # 100).  However, nowhere in its sur-reply does the City mention the Plaintiffs' additional request.  *See generally City's Sur-reply*.

A prevailing party "normally is entitled to attorneys' fees incurred in the pursuit of fees under section 1988."  *Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331, 340 (1st Cir. 2008).  The First Circuit has cautioned, however, that the "reasonableness requirement applies without diminution."  *Id.*  When determining a reasonable fee, the Court should keep in mind that ordinarily it is considerably more difficult to litigate successfully the merits of a civil rights claim than it is to litigate the subsequent fee request.  *Brewster v. Dukakis*, 3 F.3d 488, 494 (1st

Cir. 1993) (observing that time spent in fee litigation "often amounts to little more than documenting what a lawyer did and why he or she did it" (internal quotation omitted)). This customary differential in complexity has led to compensation for attorneys' time spent on fee litigation "at lower rates than those deemed reasonable for the main litigation." *Torres-Rivera*, 524 F.3d at 340. Additionally, the Court should consider the ratio of time spent litigating the merits to time spent litigating the fee request. *Kazanjian v. MSM Enters., Inc.*, No. 93-227-P-C, 1995 U.S. Dist. LEXIS 4482, at *10-11 (D. Me. Mar. 15, 1995); *Weinberger v. Great N. Nekoosa Corp.*, 801 F. Supp. 804, 823 (D. Me. 1992), *aff'd sub nom. BTZ, Inc. v. Great N. Nekoosa Corp.*, 47 F.3d 463 (1st Cir. 1995).

In the absence of an objection from the City, the Court is satisfied that the Plaintiffs' reduced request of $6,000 is a reasonable request for attorney fees. From the Court's perspective, this fee litigation was atypical. The City vigorously contested the Plaintiffs' status as prevailing parties and advocated for drastic reductions under *Farrar* and *Hensley*. The Plaintiffs therefore had to parse their successes and convince the Court the City was wrong. Indeed, had the Plaintiffs' lawyers done no more than document what they did and why they did it, they would have run the risk of failing to sustain their burden of proving the reasonableness of the hours claimed. *Torres-Rivera*, 524 F.3d at 340. In addition, a $6,000 fee for 40.3 hours of work yields an average hourly rate of roughly $150. Having already approved higher rates for all Plaintiffs' counsel, the Court concludes that $150 per hour is a reasonable rate for work on a fee request of this kind. Moreover, if the roughly 50 hours spent by the City's lawyers defending the Plaintiffs' fee request is any indicator, Mr. Webbert's and Mr. Katler's 40.3 hours appears a reasonable amount of time to devote to what was a hotly contested issue of significant consequence. Finally, the global comparison that *Kazanjian* suggests changes nothing. The

31

Plaintiffs' lawyers spent 827.60 hours litigating the merits and only 40.3 hours securing their fee. A time ratio of roughly 20:1 appears well within the range of reasonableness, as does an additional fee award that is only 8% of the net lodestar amount of $77,264.78. *See Kazanjian*, 1995 U.S. Dist. LEXIS 4482, at *10-11.

## III.   CONCLUSION

The Court GRANTS Plaintiffs' Motion for Award of Attorney's Fees and Litigation Expenses (Docket # 83) and ORDERS payment to the Maine Civil Liberties Union Foundation in the total amount of $83,264.78.[22]

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 9th day of June, 2009

---

[22] The Plaintiffs' memorandum states in a footnote that "[p]ayment should be made by Defendant to the Maine Civil Liberties Union Foundation." *Pls.' Mot.* at 18 n.3. Under the terms of their Retainer Agreements, Timothy Sullivan and Lawrence Dansinger assigned their interests in statutory fees to their attorneys, and further agreed that any payment of attorney fees shall be paid to the Maine Civil Liberties Union Foundation (MCLU) as disbursing agent for the clients and then distributed by the MCLU in accordance with an agreed-upon formula. *Webbert Decl.*, Attach. 3. The Court has not allocated the total award among the three attorneys, because it is not inclined to do for them what they and the MCLU can do for themselves.